## LOUISIANA v. TEXAS.

ORIGINAL.

No. 6. Submitted October 24, 1899. — Decided January 15, 1900.

The bill of complaint on the part of Louisiana against Texas, alleged that the State of Texas had granted to its Governor and its Health Officer extensive powers over the establishment and maintenance of quarantines over infectious or contagious diseases ; that this power had been exercised in a way and with a purpose to build up and benefit the commerce of cities in Texas which were rivals of New Orleans; and it prayed for a decree that "neither the State of Texas, nor her Governor, nor her Health Officer, have the right, under the cover of an exercise of police or quarantine powers, to declare and enforce against interstate commerce, between the State of Louisiana, or any part thereof, and the State of Texas, an absolute embargo, prohibiting the movement and conduct of said commerce, or to make, declare and enforce against places infected with yellow fever or other infectious diseases in the State of Louisiana discriminative quarantine rules or regulations, affecting interstate commerce between the State of Louisiana, or any part thereof, and the State of Texas, different from and more burdensome than the quarantine rules and regulations affecting interstate or foreign commerce between the State of Texas and other States and countries infected with yellow fever and other infectious diseases;" and the bill asked for an injunction, restraining the Texas officials from enforcing the Texas laws in the manner in which they were enforced. *Held :*

1

(1) That in order to maintain jurisdiction of the bill it must appear that the controversy to be determined was a controversy arising directly between the State of Louisiana and the State of Texas, and not a controversy in vindication of the grievances of particular individuals;

(2) That the gravamen of this bill was not a special and peculiar injury, such as would sustain an action by a private person, but that the State of Louisiana presented herself in the attitude of *parens patriæ*, trustee, guardian or representative of all her citizens;

(3) That the bill does not set up facts which show that the State of Texas has so authorized or confirmed the alleged action of her health officer as to make it her own, or from which it necessarily follows that the two States are in controversy within the meaning of the Constitution;

(4) That the court was unable to hold that the bill could be maintained as presenting a case of controversy between a State and citizens of another State;

(5) That the bill could not be maintained as against the health officer alone, on the theory that his conduct was in violation of or in excess of a valid law of the State.

MR. JUSTICE WHITE concurred in the result. MR. JUSTICE HARLAN concurred in the result, but dissented from some of the propositions contained in the opinion of the court: as did also MR. JUSTICE BROWN.

THE State of Louisiana by her Governor applied to this court for leave to file a bill of complaint against the State of Texas, her Governor and her health officer. Argument was had on objections to granting leave, but it appearing to the court the better course in this instance, leave was granted, and the bill filed, whereupon defendants demurred, and the cause was submitted on the oral argument already had and printed briefs.

The bill alleged: "That the city of New Orleans, one of the great commercial cities of this republic, and the second export city of this continent, containing about two hundred and seventy-five thousand inhabitants, many of whom are largely engaged in interstate commerce with the inhabitants of the State of Texas, is situated within the territory of your orator; that said city contains nearly one fourth of all the inhabitants of your orator, and the assessed values of her property are more than one half the assessed values of the whole State, and she contributes by taxes and licenses more than five eighths of your orator's revenue.

" That two lines of railroad, the Southern Pacific and the Texas and Pacific, run directly from the city of New Orleans through the States of Louisiana and Texas, and into the States and Territories of the United States and of Mexico, beyond the State of Texas, with the inhabitants of which States and Territories the citizens of New Orleans are also engaged in interstate and foreign commerce, such commerce largely following the lines of said railroads and their many connections.

" That the State of Texas, by her Revised Civil Statutes, adopted at the regular session of the Twenty-fourth Legislature, held in the year 1895, being Title XCII thereof, has granted to her Governor and her health officer extensive powers over the establishment and maintenance of quarantines against infectious or contagious diseases, with authority to make rules and regulations for the detention of vessels, persons and property coming into the State from places infected, or deemed to be infected, with such diseases.

" That Joseph D. Sayers, a citizen of the State of Texas, is now, and has been for some time past, Governor of said State.

" That William F. Blunt, a citizen of the State of Texas, is now, and has been for some time past, the state health officer of the State of Texas.

" That the ports of said State, situated on the Gulf coast, are engaged in commerce with the ports of Mexico, Central and South America and Cuba, known to be permanently infected with yellow fever; said commerce being largely competitive with similar commerce coming to the port of New Orleans.

" That on the 1st day of March, 1899, Joseph D. Sayers, Governor of the State of Texas, under the provisions of the said laws, issued his proclamation establishing quarantine on the Gulf coast and Rio Grande border against all places, persons or things coming from places infected by yellow fever, etc., a copy of which proclamation is hereto annexed and made part of this bill and marked Exhibit ' A.'

" That the rules and regulations established in said quarantine proclamation permit trade and commerce between such infected ports and the State of Texas, and provide for the

fumigation and reasonable detention of ships and cargoes from infected ports.

"That on or about the 31st day of August, 1899, a case of yellow fever was officially declared to exist in the city of New Orleans, in a part of the city several miles away from the commercial part thereof, and from that time to this several other sporadic cases have been reported in similar parts of the city.

"That as soon as said first case was reported the said William F. Blunt, Health Officer of the State of Texas, claiming to act under the provisions of Article 4324 of the Revised Civil Statutes, under the pretence of establishing a quarantine, placed an embargo on all interstate commerce between the city of New Orleans and the State of Texas, absolutely prohibiting all common carriers entering the State of Texas from bringing into the State any freight or passengers or even the mails of the United States, coming from the city of New Orleans, and to enforce these orders he immediately placed, and now maintains, armed guards, acting under the authority of the State of Texas, on all the lines of travel from the State of Louisiana into the State of Texas, with instructions to enforce the embargo declared by him *vi et armis*, which instructions these armed guards are carrying out to the letter; that about six days later he modified his order so as to permit the Government of the United States to carry and deliver the mails; and also modified his order so as to permit persons and their baggage to enter the State of Texas, after ten days' detention at the quarantine detention camps, established by him, and after fumigation of their baggage; but that he now maintains, and announces his intention to maintain indefinitely, his absolute prohibition of all interstate commerce between the city of New Orleans and the State of Texas; that he has refused to permit the introduction of sulphuric acid in iron drums, unpacked hardware, machinery and other articles coming from localities in the city of New Orleans, far removed from the places where the sporadic cases of fever have occurred, and which by their nature are concededly incapable of conveying infection; that he had estab-

lished no system of classification or inspection of the articles of interstate commerce, coming from the city of New Orleans, to determine whether they are, or may be, infected, or whether they are capable, or not, of conveying infection, no period of detention for such articles, no place or method of disinfection thereof; his only method being absolute and unconditional prohibition of such interstate commerce; that it is a notorious fact, and well known to said Blunt, that all of the interstate commerce between New Orleans and Texas is carried on by railroads, and none by water communication between the port of New Orleans and the Texas ports, and that the effect of his orders is to destroy all such commerce, to take away the trade of the merchants and business men of the city of New Orleans, and to transfer that trade to rival business cities in the State of Texas.

"That while Joseph D. Sayers, Governor of the State of Texas, has issued no formal proclamation of quarantine, as provided by law, to wit, Art. 4324 of the Revised Civil Statutes, defining the rules and regulations of such quarantine so declared by said Blunt, your orator charges that the rules and regulations established by said Blunt have the full force of law until modified or changed by the proclamation of the Governor, and that the Governor knows all these facts and approves and adopts the same, and permits these rules and regulations to stand and to be executed in full force and effect as established by said Blunt.

"Now your orator recognizes the right and power of the State of Texas and the public officials thereof to take prudent and reasonable measures to protect the people of said State from infection, to establish quarantine and reasonable inspection laws, but your orator denies that said State, or its officials, acting under its laws, under the cover of exercising its police powers, can prohibit or so burden interstate commerce as to make such commerce impossible.

"Your orator avers that it is a recognized and acknowledged fact by all the sanitarians and health officials of the various States exposed to infection by yellow fever and by the health officials of the United States, and by all scientific

students of infection and sanitation, that commerce can be conducted between infected and non-infected points, with small inconvenience and without any danger of infection, by classifying the articles of commerce and by pursuing certain well-recognized rules and precautions with reference to the articles and vehicles of commerce.

"That after the yellow fever outbreak of 1897 a quarantine convention was held in Mobile, Ala., and, on the advice of that convention, a conference of the health officials of Virginia, South Carolina, Georgia, Florida, Alabama, Mississippi, Missouri and the United States Marine Hospital Service met at Atlanta, Ga., and formulated such regulations which were adopted by the Boards of Health of all said States, and, as subsequently revised, are now in full force and effect between the said States; that additional experience having been gained by the reappearance of yellow fever in the fall of 1898, a revising conference was held in the city of New Orleans on February 9, 1899, at which conference the Atlanta regulations were in some respects modified. A copy of the said regulations, original and as modified, are hereto annexed and made part of this bill and marked Exhibit ' B.'

"Your orator avers that said William F. Blunt, or his predecessor in office, was health officer of the State of Texas at the time these conferences were held, that he and his predecessor in office refused or neglected to attend them in person or by representative, and he has continually refused to adopt the Atlanta regulations, or any of them, or any regulations similar to them, and insists, as his predecessor in office insisted, upon being a law to himself, and upon using no means of dealing with yellow fever infection in the city of New Orleans, or elsewhere in the State of Louisiana, real or imaginary, except an absolute embargo upon interstate commerce to be established at his pleasure and to last as long as he chooses to maintain it.

"That in pursuance of this policy, in the year 1897, his predecessor in office established a similar embargo on interstate commerce between New Orleans and other points in Louisiana, supposed by him to be infected, and the State of

Texas, on the 10th day of September; and refused to remove or to modify said embargo until the —— day of December, 1897, during which period he even refused to permit railroad cars that had been in the city of New Orleans to enter or even pass through the State of Texas, on their way to the countries, States and Territories beyond.

"That in pursuance of the same policy, in the year 1898, the said William F. Blunt, health officer, and the Governor of the State of Texas, established a similar embargo on all interstate commerce between the State of Louisiana and the State of Texas, on the 18th day of September, and refused to remove or modify the same until the 1st day of November.

"That in pursuance of the same policy, the said William F. Blunt, because a single case of yellow fever was declared in the city of New Orleans, did on May 30, 1899, establish a similar embargo on interstate commerce between the city of New Orleans and the State of Texas, which he refused to modify or to remove until June 9, 1899, and then only under great pressure, although he was advised on June 2, 1899, by the representatives of the health authorities of the States of Alabama and Mississippi, of the United States Marine Hospital Service, and of the Louisiana state board of health, who had been for some days in the city of New Orleans, making a personal inspection of her sanitary and health conditions, that they deemed it 'unnecessary and unwise for any State or city to quarantine against New Orleans under present conditions.'

"Your orator avers that the State of Texas, her Governor and her health officer, as shown by the rules and regulations established by them in the proclamation aforesaid for the quarantine on the Gulf coast, admit the truthfulness of the claim of your orator that commerce can be carried on with infected places and ports, under reasonable rules and regulations as to inspection, fumigation and detention, and admit that there are articles of commerce incapable of conveying infection, and actually permit such commerce in all articles to be so carried on to the advantage and benefit of the commerce of the ports of Texas and her merchants engaged in commerce in said ports.

"Your orator avers that the effect of the embargoes imposed by the State of Texas upon the commerce of the city of New Orleans with Texas is to build up and benefit the commerce of the city of Galveston, in Texas, and the commerce of other cities in Texas, all of which are commercial rivals of the city of New Orleans for the large commerce of the State of Texas and the adjoining States and Territories.

"That prior to the embargoes aforesaid of the years 1897 and 1898 the city of New Orleans was the greatest cotton exporting port of the United States, and a very large portion of the cotton grown in Texas was exported through the port of New Orleans; for instance, for the season of 1894–5 more than 31 per cent thereof; for the season 1895–6 more than 30 per cent thereof; for the season 1896–7, 25 per cent thereof.

"That as consequence of the two trade embargoes aforesaid the percentage of the Texas cotton crop exported through the port of New Orleans for the season of 1897–8 was only 19 per cent; and for the season of 1898–9 was only 15 per cent; and for the season of 1898–9, ending September 1, 1899, the city of Galveston handled more export cotton than the city of New Orleans.

"That the effect of said embargoes is all the more disastrous to the commerce of your orator, and of her cities and towns, because declared and made operative during the months of September, October, November and the early part of December, the period of the greatest activity and the largest movement of commerce among the States of the South, and between the State of Louisiana, the city of New Orleans and the State of Texas.

"Now your orator avers that in view of the unreasonable, harsh, prohibitive and discriminating character of the pretended quarantines, declared and maintained by the State of Texas and her health officer, against the city of New Orleans and other localities in the State of Louisiana, is nothing less than a commercial war declared against your orator, her ports, cities and citizens; not for the *bona fide* purpose of protecting the health of the State of Texas, but for the purpose of in-

creasing the trade and commerce of the State of Texas and of her ports, cities and citizens, to the great damage and injury of your orator and her citizens ; that such embargoes on interstate commerce injure and impoverish your orator's citizens, reduce the value of her taxable property, diminish her revenues, retard immigration, reduce the value of her public lands, and deprive her citizens of their rights and privileges as citizens of the United States.

"Your orator avers that the embargo upon interstate commerce between the city of New Orleans, in the State of Louisiana, and the State of Texas, established by said Blunt on or about the first day of September, 1899, and now maintained by him and the other officials of the State of Texas, will be continued by them for an indefinite period, to the great damage and injury of your orator's ports, commerce and revenues, and to the commerce of her citizens and to the rights of her citizens under the Constitution of the United States, unless they be enjoined and restrained by order of this court.

"Your orator avers that, from the past conduct of the State of Texas, and of her Governors and health officers, your orator is justified in averring and charging, and does aver and charge, that it is the fixed purpose and intention of the said State, and of her Governors and health officers, whenever in the future any case of yellow fever, or other infectious disease, occurs in any parish, city or town within your orator's borders, to immediately declare, set up and maintain an absolute prohibition of interstate commerce between said supposed infected parish, city or town, and the State of Texas, and to keep the same in force during the pleasure of such officials, or to make and establish discriminative rules and regulations covering quarantines on such interstate commerce, different from and more burdensome than the rules and regulations concerning quarantines on interstate commerce with other States and foreign commerce with countries also infected with yellow fever, or other infectious diseases, and thereby to injure and oppress your orator and her citizens.

"Now your orator avers that the absolute prohibition

against the movement and operation of interstate commerce between the city of New Orleans and the inhabitants thereof, and the State of Texas and the inhabitants thereof, established by said William F. Blunt, health officer of the State of Texas and now maintained and enforced by him, the Governor and the other officials of the State of Texas, is in direct contravention of the provisions of the Constitution of the United States, and particularly of that clause thereof which grants to the Congress power to regulate commerce with foreign nations, among the several States, and with the Indian tribes, and is null, void and of no effect, and the continuance thereof ought to be restrained by the order of this honorable court.

"Your orator further avers that the various cities, counties and towns in the State of Texas have authority, under the statutes aforesaid, to establish quarantines, but all such quarantines are by statute subordinate to, subject to and regulated by the rules and regulations prescribed by the Governor and the state health officer, and that, therefore, all such quarantines are dirigible and controllable by the Governor and the health officer of Texas.

"Your orator is informed and believes and so charges that it is the intention of certain counties, cities and towns along the lines of the railroads aforesaid, in case your honors should restrain the operation of the embargo established as aforesaid by William F. Blunt, state health officer, to severally establish the same embargo on their own account, and to prevent the passage of trains on said railroads carrying interstate commerce from the city of New Orleans through them to other parts of the State of Texas and to other States, and to so hinder, obstruct and delay the transportation of said commerce along the lines of railroad running through their limits as to render its conduct impossible; that in case it should be considered that the public authorities of such counties, towns and cities are not personally bound by any order your honors may issue in this cause, and in case they should attempt to carry out any such illegal plan, your orator reserves the right hereafter to make such officials parties to this bill, so as to subject them to the control of the court."

The bill then prayed for answers under oath; that the court decree "that neither the State of Texas, nor her Governor, nor her health officer, have the right, under the cover of an exercise of police or quarantine powers, to declare and enforce against interstate commerce, between the State of Louisiana, or any part thereof, and the State of Texas, an absolute embargo, prohibiting the movement and conduct of said commerce, or to make, declare and enforce against places infected with yellow fever, or other infectious diseases, in the State of Louisiana, discriminative quarantine rules and regulations affecting interstate commerce between the State of Louisiana, or any part thereof, and the State of Texas, different from and more burdensome than the quarantine rules and regulations affecting interstate or foreign commerce between the State of Texas and other States and countries infected with yellow fever, or other infectious diseases, and that the embargo and prohibition upon interstate commerce between the city of New Orleans and the State of Texas, declared by William F. Blunt, health officer of the State of Texas, on or about the 1st day of September, 1899, and now maintained and enforced by the State of Texas, under the guise of a quarantine against yellow fever, is contrary to the Constitution of the United States, null, void and of no effect and validity;" that a preliminary injunction be issued "prohibiting, enjoining and restraining the State of Texas, and all of her officers and public officials, and prohibiting, enjoining and restraining Joseph D. Sayers, Governor of the State of Texas, and William F. Blunt, health officer of the State of Texas, their successors in office, and all of their subordinates, assistants, agents and employés, from establishing, maintaining and enforcing, or attempting to establish, maintain and enforce, under the guise of a quarantine against yellow fever, any embargo or absolute prohibition upon interstate commerce between the State of Louisiana, or any part thereof, and the State of Texas, or from establishing, maintaining and enforcing, or attempting to establish, maintain and enforce against interstate commerce between the State of Louisiana, or any part thereof, and the State of Texas, discriminative and burdensome quar-

antine regulations other and different from the regulations established by such authorities against foreign and interstate commerce between the State of Texas and other countries and States infected with yellow fever, or other infectious diseases, and particularly enjoining, prohibiting and restraining them, and each of them, from maintaining or enforcing, directly or indirectly, the prohibitory embargo on interstate commerce established against the city of New Orleans on or about the first day of September, 1899, under the guise and pretence of a quarantine regulation;" and that such injunction be made perpetual on final hearing; for costs; and for general relief:·

The demurrer assigned the following causes:

"First. That this court has no jurisdiction of either the parties to or of the subject-matter of this suit, because it appears from the face of said bill that the matters complained of do not constitute, within the meaning of the Constitution of the United States, any controversy between the States of Louisiana and Texas.

"Second. Because the allegations of said bill show that the only issues presented by said bill arise between the State of Texas or her officers and certain persons in the city of New Orleans, in the State of Louisiana, who are engaged in interstate commerce, and which do not in any manner concern the State of Louisiana as a corporate body or State.

"Third. Because said bill shows upon its face that this suit is in reality for and on behalf of certain individuals engaged in interstate commerce, and while the suit is attempted to be prosecuted for and in the name of the State of Louisiana, said State is in effect loaning its name to said individuals and is only a nominal party, the real parties at interest being said individuals in the said city of New Orleans who are engaged in interstate commerce.

"Fourth. Because it appears from the face of said bill that the State of Louisiana, in her right of sovereignty, is seeking to maintain this suit for the redress of the supposed wrongs of her citizens in regard to interstate commerce, while under the Constitution and laws the said State possesses no such sovereignty as empowers her to bring an original suit in this court for such purpose.

"Fifth. Because it appears from the face of said bill that no property right of the State of Louisiana is in any manner affected by the quarantine complained of, nor is any such property right involved in this suit as would give this court original jurisdiction of this cause."

*Mr. Milton J. Cunningham, Mr. Edgar H. Farrar, Mr. Benjamin F. Jonas, Mr. Ernest B. Kruttschnitt,* and *Mr. E. Howard McCaleb* for the State of Louisiana.

*Mr. Thomas S. Smith* and *Mr. Robert H. Ward* for the State of Texas and others.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The ninth of the Articles of Confederation of 1778 provided that the Congress should be "the last resort on appeal in all disputes and differences now subsisting or that may hereafter arise between two or more States concerning boundary, jurisdiction or any other cause whatever," the authority to be exercised through a tribunal to be created by the Congress as prescribed, and whose judgment should be final and conclusive; and also that "all controversies concerning the private right of soil claimed under different grants of two or more States" should be determined in the same manner.

In the Constitutional Convention, the Committee of Detail, composed of Rutledge, Randolph, Gorham, Ellsworth and Wilson, to which the resolutions arrived at by the Convention and sundry propositions had been referred, reported on the sixth of August, A.D. 1787, a draft of a Constitution, consisting of twenty-three articles.

The second section of the ninth article provided that as to "all disputes and controversies now subsisting, or that may hereafter subsist, between two or more States, respecting jurisdiction or territory," the Senate should have power to designate a special tribunal to finally determine the same by its judgment; and by the third section, "all controversies concerning lands claimed under different grants of two or more States" were to be similarly determined.

The third section of the proposed eleventh article provided, among other things, that the jurisdiction of the Supreme Court should extend "to controversies between two or more States, except such as shall regard territory or jurisdiction; between a State and citizens of another State; between citizens of different States; and between a State, or the citizens thereof, and foreign States, citizens or subjects."

On the twenty-fifth of August Mr. Rutledge said in respect to sections two and three of article nine: "This provision for deciding controversies between the States was necessary under the Confederation, but will be rendered unnecessary by the National Judiciary now to be established;" and on his motion the sections were stricken out.

The words "between citizens of the same State claiming lands under grants of different States" were subsequently inserted in the third section of the eleventh article, and the words "except such as shall regard territory or jurisdiction" omitted. 1 Elliot, 223, 224, 261, 262, 267, 270; 5 Elliot, 471; Meigs on Growth of the Constitution, 244, 249.

Clauses 1 and 2 of the second section of Article III of the Constitution as finally adopted read:

"The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority; to all cases affecting ambassadors, other public ministers and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States, between citizens of the same State claiming lands under grants of different States, and between a State, or the citizens thereof, and foreign States, citizens or subjects.

"In all cases affecting ambassadors, other public ministers and consuls, and those in which a State shall be party, the Supreme Court shall have original jurisdiction. In all the other cases before mentioned, the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions, and under such regulations as the Congress shall make."

The reference we have made to the derivation of the words "controversies between two or more States" manifestly indicates that the framers of the Constitution intended that they should include something more than controversies over "territory or jurisdiction"; for in the original draft as reported the latter controversies were to be disposed of by the Senate, and controversies other than those by the judiciary, to which by amendment all were finally committed. But it is apparent that the jurisdiction is of so delicate and grave a character that it was not contemplated that it would be exercised save when the necessity was absolute, and the matter in itself properly justiciable.

Undoubtedly, as remarked by Mr. Justice Bradley in *Hans* v. *Louisiana*, 134 U. S. 1, 15, the Constitution made some things "justiciable which were not known as such at the common law; such, for example, as controversies between States as to boundary lines, and other questions admitting of judicial solution. . . . The establishment of this new branch of jurisdiction seemed to be necessary from the extinguishment of diplomatic relations between the States. Of other controversies between a State and another State or its citizens, which on the settled principles of public law are not subjects of judicial cognizance, this court has often declined to take jurisdiction. See *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, 288, 289, and cases there cited."

By the Judiciary Act of 1789 the judicial system was organized and the powers of the different courts defined. Its thirteenth section, carried forward as § 687 of the Revised Statutes, provided "that the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature, where a State is a party, except between a State and its citizens; and except also between a State and citizens of other States, or aliens, in which latter case it shall have original but not exclusive jurisdiction."

The language of the second clause of the second section of Article III, "in all cases in which a State shall be party," means in all the enumerated cases in which a State shall be a party, and this is stated expressly when the clause speaks

of the other cases where appellate jurisdiction is to be exercised. This second clause distributes the jurisdiction conferred in the previous one into original and appellate jurisdiction, but does not profess to confer any. The original jurisdiction depends solely on the character of the parties, and is confined to the cases in which are those enumerated parties and those only. *California* v. *Southern Pacific Railroad Company*, 157 U. S. 229, 259 ; *United States* v. *Texas*, 143 U. S. 621. And by the Constitution and according to the statute, the original jurisdiction of this court is exclusive over suits between States, though not exclusive over those between a State and citizens of another State.

On the 8th of January, 1798, the Eleventh Amendment was ratified, as follows : " The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

Referring to this Amendment, Mr. Chief Justice Waite, in *New Hampshire* v. *Louisiana* and *New York* v. *Louisiana*, 108 U. S. 76, 91, said : " The evident purpose of the Amendment, so promptly proposed and finally adopted, was to prohibit all suits against a State by or for citizens of other States, or aliens, without the consent of the State to be sued, and in our opinion, one State cannot create a controversy with another State within the meaning of that term as used in the judicial clauses of the Constitution by assuming the prosecution of debts owing by other States to its citizens."

In order then to maintain jurisdiction of this bill of complaint as against the State of Texas, it must appear that the controversy to be determined is a controversy arising directly between the State of Louisiana and the State of Texas, and not a controversy in the vindication of grievances of particular individuals.

By the Constitution, the States are forbidden to " enter into any treaty, alliance or confederation ; grant letters of marque and reprisal ; " or, without the consent of Congress, " keep troops, or ships of war in time of peace, enter into any agree-

ment or compact with another State, or with a foreign power, or engage in war, unless actually invaded, or in such imminent danger as will not admit of delay." Art. 1, sec. 10.

Controversies between them arising out of public relations and intercourse cannot be settled either by war or diplomacy, though, with the consent of Congress, they may be composed by agreement. As pointed out by Mr. Justice Field in *Virginia* v. *Tennessee*, 148 U. S. 503, 519, there are many matters on which the different States may agree that can in no respect concern the United States, while there are other compacts or agreements to which the prohibition of the Constitution applies. And as to this, he quotes from Mr. Justice Story as follows: " Story, in his Commentaries, (§ 1403,) referring to a previous part of the same section of the Constitution in which the clause in question appears, observed that its language ' may be more plausibly interpreted from the terms used, " treaty, alliance or confederation," and upon the ground that the sense of each is best known by its association (*noscitur à sociis*) to apply to treaties of a political character; such as treaties of alliance for purposes of peace and war; and treaties of confederation, in which the parties are leagued for mutual government, political coöperation, and the exercise of political sovereignty, and treaties of cession of sovereignty, or conferring internal political jurisdiction, or external political dependence, or general commercial privileges ;' and that ' the latter clause, " compacts and agreements," might then very properly apply to such as regarded what might be deemed mere private rights of sovereignty; such as questions of boundary; interests in lands situate in the territory of each other, and other internal regulations for the mutual comfort and convenience of States bordering on each other.' And he adds: ' In such cases the consent of Congress may be properly required, in order to check any infringement of the rights of the National Government; and, at the same time, a total prohibition to enter into any compact or agreement might be attended with permanent inconvenience or public mischief.' " But it was also there ruled that where the consent of Congress was requisite, it might be given subsequently or might be

implied from subsequent action of Congress itself toward the two States.

In the absence of agreement it may be that a controversy might arise between two States for the determination of which the original jurisdiction of this court could be invoked, but there must be a direct issue between them, and the subject-matter must be susceptible of judicial solution. And it is difficult to conceive of a direct issue between two States in respect of a matter where no effort at accommodation has been made; nor can it be conceded that it is within the judicial function to inquire into the motives of a state legislature in passing a law, or of the chief magistrate of a State in enforcing it in the exercise of his discretion and judgment. Public policy forbids the imputation to authorized official action of any other than legitimate motives.

As might be expected in view of the nature of the jurisdiction, the cases are few in which the aid of the court has been sought in "controversies between two or more States." They are cited in *Wisconsin* v. *Pelican Ins. Co.*, 127 U. S. 265, and are chiefly controversies as to boundaries.

In *South Carolina* v. *Georgia*, 93 U. S. 4, 14, a bill was filed for an injunction against the State of Georgia, the Secretary of War and others, from "obstructing or interrupting" the navigation of the Savannah River in violation of the compact entered into between the States of South Carolina and Georgia on the 24th day of April, 1787. The bill was dismissed because no unlawful obstruction of navigation was proved, but the question was expressly reserved whether "a State, when suing in this court for the prevention of a nuisance in a navigable river of the United States, must not aver and show that it will sustain some special and peculiar injury therefrom, and such as would enable a private person to maintain a similar action in another court."

So in *Wisconsin* v. *Duluth*, 96 U. S. 379, 382, the contention that the court could "take cognizance of no question which concerns alone the rights of a State in her political or sovereign character; that to sustain the suit she must have some proprietary interest which is affected by the defendant," was not passed upon.

In *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 13 How. 519, the court treated the suit as brought to protect the property of the State of Pennsylvania.

But in *Debs, Petitioner*, 158 U. S. 564, involving a case in the Circuit Court in which the United States had sought relief by injunction, it was observed: "That while it is not the province of the Government to interfere in any mere matter of private controversy between individuals, or to use its great powers to enforce the rights of one against another, yet, whenever the wrongs complained of are such as affect the public at large, and are in respect of matters which by the Constitution are intrusted to the care of the Nation, and concerning which the Nation owes the duty to all the citizens of securing to them their common rights, then the mere fact that the Government has no pecuniary interest in the controversy is not sufficient to exclude it from the courts or prevent it from taking measures therein to fully discharge those constitutional duties."

It is in this aspect that the bill before us is framed. Its gravamen is not a special and peculiar injury such as would sustain an action by a private person, but the State of Louisiana presents herself in the attitude of *parens patriæ*, trustee, guardian or representative of all her citizens.

She does this from the point of view that the State of Texas is intentionally absolutely interdicting interstate commerce as respects the State of Louisiana by means of unnecessary and unreasonable quarantine regulations. Inasmuch as the vindication of the freedom of interstate commerce is not committed to the State of Louisiana, and that State is not engaged in such commerce, the cause of action must be regarded not as involving any infringement of the powers of the State of Louisiana, or any special injury to her property, but as asserting that the State is entitled to seek relief in this way because the matters complained of affect her citizens at large. Nevertheless if the case stated is not one presenting a controversy between these States, the exercise of original jurisdiction by this court as against the State of Texas cannot be maintained.

By Title xcn of the Revised Statutes of the State of Texas of 1895, " The Governor is empowered to issue his proclamation declaring quarantine on the coast, or elsewhere within this State, whenever in his judgment quarantine may become necessary, and such quarantine may continue for any length of time as in the judgment of the Governor the safety and security of the people may require." It is made the Governor's duty " to select and appoint, by and with the advice and consent of the Senate, from the most skilful physicians of the State of Texas, one physician who shall be known as health officer of the State, and shall from previous and active practice be familiar with yellow fever and pledged to the importance of both quarantine and sanitation." . It was also provided that " whenever the Governor has reason to believe that the State of Texas is threatened at any point or place on the coast, border or elsewhere within the State with the introduction or dissemination of yellow fever contagion, or any other infectious and contagious disease that can and should, in the opinion of the state health officer, be guarded against by state quarantine, he shall, by proclamation, immediately declare said quarantine against any and all such places, and direct the state health officer to promptly establish and enforce the restrictions and conditions imposed and indicated by said quarantine proclamation, and when from any cause the Governor cannot act, and the exigencies of the threatened danger require immediate action, the state health officer is empowered to declare quarantine as prescribed in this article, and maintain the same until the Governor shall officially take such action as he may see proper." And further, that the laws in regard to state quarantine should remain and be in full force and operation on the coast or elsewhere in the State as the Governor or health officer might direct, and be enforced as heretofore, " with such additional changes in station and general management as the Governor may think proper." Differences and disputes in regard to local quarantine were to be determined by the Governor, and all county and municipal quarantine was made subordinate to such rules and regulations as might be prescribed by the Governor or state health officer. It

was made the duty of any county, town or city authority on the coast or elsewhere in the State, on the promulgation of the Governor's proclamation declaring quarantine, to provide suitable stations and employ competent physicians as health officers subject to the approval of the Governor, and in case of the failure of the authorities to do so, the Governor was empowered to act. Provision was made for the detention of persons, and vessels, and for the disinfection of vessels and their cargoes and passengers arriving at the ports of Texas from any infected port or district, and for rules and regulations in regard thereto, " the object of such rules and regulations being to provide safety for the public health of the State without unnecessary restriction upon commerce and travel."

It is not charged that this statute is invalid nor could it be if tested by its terms. While it is true that the power vested in Congress to regulate commerce among the States is a power complete in itself, acknowledging no limitations other than those prescribed in the Constitution, and that where the action of the States in the exercise of their reserved powers comes into collision with it, the latter must give way, yet it is also true that quarantine laws belong to that class of state legislation which is valid until displaced by Congress, and that such legislation has been expressly recognized by the laws of the United States almost from the beginning of the Government.

In *Morgan Steamship Company* v. *Louisiana Board of Health*, 118 U. S. 455, this was so held, and Mr. Justice Miller, delivering the opinion of the court, said: " The matter is one in which the rules that should govern it may in many respects be different in different localities and for that reason be better understood and more wisely established by the local authorities. The practice which should control a quarantine station on the Mississippi River, one hundred miles from the sea, may be widely and wisely different from that which is best for the harbor of New York." Hence, even if Congress had remained silent on the subject, it would not have followed that the exercise of the police power of the State in this regard, although necessarily operating on inter-

state commerce, would be therefore invalid. Although from the nature and subjects of the power of regulating commerce it must be ordinarily exercised by the National Government exclusively, this has not been held to be so where in relation to the particular subject-matter different rules might be suitable in different localities. At the same time, Congress could by affirmative action displace the local laws, substitute laws of its own, and thus correct any unjustifiable and oppressive exercise of power by state legislation.

The complaint here, however, is not that the laws of Texas in respect of quarantine are invalid, but that the health officer, by rules and regulations framed and put in force by him thereunder, places an embargo in fact on all interstate commerce between the State of Louisiana and the State of Texas, and that the Governor permits these rules and regulations to stand and be enforced, although he has the power to modify or change them. The bill is not rested merely on the ground of the imposition of an embargo without regard to motive, but charges that the rules and regulations are more stringent than called for by the particular exigency, and are purposely framed with the view to benefit the State of Texas, and the city of Galveston in particular, at the expense of the State of Louisiana, and especially of the city of New Orleans.

But in order that a controversy between States, justiciable in this court, can be held to exist, something more must be put forward than that the citizens of one State are injured by the maladministration of the laws of another. The States cannot make war, or enter into treaties, though they may, with the consent of Congress, make compacts and agreements. When there is no agreement, whose breach might create it, a controversy between States does not arise unless the action complained of is state action, and acts of state officers in abuse or excess of their powers cannot be laid hold of as in themselves committing one State to a distinct collision with a sister State.

In our judgment this bill does not set up facts which show that the State of Texas has so authorized or confirmed the alleged action of her health officer as to make it her own, or

from which it necessarily follows that the two States are in controversy within the meaning of the Constitution.

Finally we are unable to hold that the bill may be maintained as presenting a case of controversy "between a State and citizens of another State."

Jurisdiction over controversies of that sort does not embrace the determination of political questions, and, where no controversy exists between States, it is not for this court to restrain the Governor of a State in the discharge of his executive functions in a matter lawfully confided to his discretion and judgment. Nor can we accept the suggestion that the bill can be maintained as against the health officer alone on the theory that his conduct is in violation or in excess of a valid law of the State, as the remedy for that would clearly lie with the state authorities, and no refusal to fulfil their duty in that regard is set up. In truth it is difficult to see how on this record there could be a controversy between the State of Louisiana and the individual defendants without involving a controversy between the States, and such a controversy, as we have said, is not presented.

*Demurrer sustained and bill dismissed.*

Mr. Justice White concurred in the result.

Mr. Justice Harlan concurring.

Taking the allegations of the bill to be true — as upon demurrer must be done — this suit cannot be regarded as one relating only to local regulations that incidentally affect interstate commerce and which the State may adopt and maintain in the absence of national regulations on the subject. On the contrary, if the allegations of the bill be true, the Texas authorities have gone beyond the necessities of the situation and established a quarantine system that is absolutely subversive of all commerce between Texas and Louisiana, particularly commerce between Texas and New Orleans. This court has often declared that the States have the power to protect the health of their people by police regulations directed to that

end, and that regulations of that character are not to be disregarded because they may indirectly or incidentally affect interstate commerce. But when that principle has been announced it has always been said that the police power of a State cannot be so exerted as to obstruct foreign or interstate commerce beyond the necessity for its exercise, and that the courts must guard vigilantly against needless intrusion upon the field committed to Congress. *Railroad Co.* v. *Husen,* 95 U. S. 465, 470–473; *Hennington* v. *Georgia,* 163 U. S. 299, 313, 318; *Missouri, Kansas and Texas Railway* v. *Haber,* 169 U. S. 613, 628, 630. The present suit proceeds distinctly on the ground that the regulations established by the authorities of Texas under its statute go beyond what is necessary to protect the people of that State against the introduction of infectious diseases and destroy the possibility of any commerce between New Orleans and Texas. Now, if Texas has no right, by its officers, to establish regulations that unreasonably or unnecessarily burden commerce between that State and Louisiana, and if the State of Louisiana is entitled, under the Constitution, to have the validity of such regulations tested in a judicial tribunal, then this court should put the defendants to their answer, and the cause should proceed to a final decree upon its merits.

But I am of opinion that the State of Louisiana, in its sovereign or corporate capacity, cannot bring any action in this court on account of the matters set forth in its bill. The case involves no property interest of that State. Nor is Louisiana charged with any duty, nor has it any power, to regulate interstate commerce. Congress alone has authority in that respect. When the Constitution gave this court jurisdiction of controversies between States, it did not thereby authorize a State to bring another State to the bar of this court for the purpose of testing the constitutionality of local statutes or regulations that do not affect the property or the powers of the complaining State in its sovereign or corporate capacity, but which at most affect only the rights of individual citizens or corporations engaged in interstate commerce. The word " controversies " in the clauses extending the judi-

cial powers of the United States to controversies "between two or more States," and to controversies "between a State and citizens of another State," and the word "party" in the clause declaring that this court shall have original jurisdiction of all cases "in which a State shall be party" refer to controversies or cases that are justiciable as between the parties thereto, and not to controversies or cases that do not involve either the property or powers of the State which complains in its sovereign or corporate capacity that its people are injuriously affected in their rights by the legislation of another State. The citizens of the complaining State may, in proper cases, invoke judicial protection of their property or rights when assailed by the laws and authorities of another State, but their State cannot, even with their consent, make their case its case and compel the offending State and its authorities to appear as defendants in an action brought in this court. If this be not so, we were wrong in *New Hampshire* v. *Louisiana,* 108 U. S. 76, in which case it was held that one State could not, by taking charge of demands or debts held by its citizens against another State, acquire the right to bring a suit in its name in this court against the debtor State.

I must express my inability to concur in that part of the opinion of the court relating to the clause of the Constitution extending the judicial power of the United States to controversies "between a State and citizens of another State." In reference to a controversy of that sort the court says that where none exist between States, it is not for this court to restrain the Governor of a State in the discharge of his executive functions in a matter confided to his discretion and judgment. But how can the Governor of a State be said to have an executive function to disregard the Constitution of the United States? How can his State authorize him to do that? It is one thing to compel the Governor of a State, by judicial order, to take affirmative action upon a designated subject. It is quite a different thing to say that being directly charged with the execution of a statute he may not be restrained by judicial orders from taking such action as he deems proper, even if what he is doing and proposes to do

is forbidden by the supreme law of the land. His official character gives him no immunity from judicial authority exerted for the protection of the constitutional rights of others against his illegal action. He cannot be invested by his State with any discretion or judgment to violate the Constitution of the United States.

The court also says that it cannot accept the suggestion that the bill can be maintained as against the health officer alone on the theory that his conduct is in violation or in excess of a valid law of the State, as the remedy for that would lie with the state authorities, and no refusal to fulfil their duty in that regard is set up; and that it is difficult to see how on this record there could be a controversy between the State of Louisiana and the individual defendants without involving a controversy between the States. But the important question presented in this case — if the State of Louisiana in its sovereign capacity can sue at all in respect of the matters set out in the bill — is, whether the regulations being enforced by the health officer are in violation of the Constitution of the United States. The opinion of the court will be construed as meaning that even if Louisiana be entitled, in her sovereign capacity, to complain of those regulations as repugnant to the Constitution of the United States, it could not proceed in this court against the defendant health officer, and that its only remedy is to appeal to the authorities of Texas, that is, to the Governor of that State, who has power to control his co-defendant, the health officer, and who has approved the regulations in question. I am not aware of any decision supporting this view. If the regulations in question are in violation of the Constitution of the United States, the defendant health officer, I submit, may, without any previous appeal to the Governor of Texas, be restrained from enforcing them, either at the suit of individuals injuriously affected by their being enforced, or at the suit of Louisiana in its corporate capacity, provided that State could sue at all in respect of such matters.

Although unable to assent to the grounds upon which the court rests its opinion, I concur in the judgment dismissing

the suit solely upon the ground that the State of Louisiana in its sovereign or corporate capacity cannot sue on account of the matters set out in the bill.

Mr. Justice Brown concurring in the result.

I am not prepared to say that if the State of Texas had placed an embargo upon the entire commerce between Louisiana and Texas, the State of Louisiana would not be sufficiently representative of the great body of her citizens to maintain this bill.

In view of the solicitude which from time immemorial States have manifested for the interest of their own citizens; of the fact that wars are frequently waged by States in vindication of individual rights, of which the last war with England, the opium war of 1840 between Great Britain and China, and the war which is now being carried on in South Africa between Great Britain and the Transvaal Republic, are all notable examples; of the further fact that treaties are entered into for the protection of individual rights, that international tribunals are constantly being established for the settlement of rights of private parties, it would seem a strange anomaly if a State of this Union, which is prohibited by the Constitution from levying war upon another State, could not invoke the authority of this court by suit to raise an embargo which had been established by another State against its citizens and their property.

An embargo, though not an act of war, is frequently resorted to as preliminary to a declaration of war, and may be treated under certain circumstances as a sufficient *casus belli*. The case made by the bill is the extreme one of a total stoppage of all commerce between the most important city in Louisiana and the entire State of Texas; and while I fully agree that resort cannot be had to this court to vindicate the rights of individual citizens, or any particular number of individuals, where a State has assumed to prohibit all kinds of commerce with the chief city of another State, I think her motive for doing so is the proper subject of judicial inquiry.

It is true that individual citizens, whose rights are seriously affected by a system of non-intercourse, might, perhaps, maintain a bill of this kind; but to make the remedy effective it would be necessary to institute a multiplicity of suits, to carry on a litigation practically against a State in the courts of that State, and to assume the entire pecuniary burden of such. litigation, when all the inhabitants of the complaining State are more or less interested in the result.

But the objection to the present bill is that it does not allege the stoppage of all commerce between the two States, but between the city of New Orleans and the State of Texas. The controversy is not one in which the citizens of Louisiana generally can be assumed to be interested, but only the citizens of New Orleans, and it therefore seems to me that the State is not the proper party complainant.