**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DEPARTMENT OF FAIR EMPLOYMENT
AND HOUSING, an agency of the
State of California,
　　　　　　　*Plaintiff-Appellant,*

　　　　　　　and

STEVEN J. CARAUDDO, Real Party in
Interest,
　　　　　　　*Petitioner-intervenor,*

　　　　　　　v.

LUCENT TECHNOLOGIES, INC.,
　　　　　　　*Defendant-Appellee.*

No. 09-15057

D.C. No.
3:07-cv-03747-PJH

DEPARTMENT OF FAIR EMPLOYMENT
AND HOUSING, an agency of the
State of California,
　　　　　　　*Plaintiff,*

　　　　　　　and

STEVEN J. CARAUDDO, Real Party in
Interest,
　　*Petitioner-intervenor-Appellant,*

　　　　　　　v.

LUCENT TECHNOLOGIES, INC.,
　　　　　　　*Defendant-Appellee.*

No. 09-15060

D.C. No.
3:07-cv-03747-PJH

OPINION

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted
November 3, 2010—Stanford, California

Filed April 26, 2011

Before: Sidney R. Thomas and Sandra S. Ikuta,
Circuit Judges, and Jane A. Restani, Judge.*

Opinion by Judge Restani;
Dissent by Judge Ikuta

---

*The Honorable Jane A. Restani, Judge for the U.S. Court of International Trade, sitting by designation.

## COUNSEL

Susan Marie Saylor, Department of Fair Employment and Housing, Oakland, California, for the plaintiff-appellant.

Steven R. Blackburn and Andrew Jonathon Sommer, Epstein Becker & Green, PC, San Francisco, California, for the defendant-appellee.

Jean K. Hyams, Boxer & Gerson LLP, Oakland, California, Claudia Center, The Legal Aid Society, San Francisco, California, and Sharon Rachel Vinick, Vinick Law Firm, San Francisco, California, for the petitioner-intervenor-appellant.

**OPINION**

RESTANI, Judge:

Plaintiff Department of Fair Employment and Housing ("DFEH") and Plaintiff-Intervenor Steven J. Carauddo appeal the district court's grant of summary judgment in favor of Defendant Lucent Technologies, Inc. ("Lucent"), Carauddo's former employer, on claims that he was terminated in violation of the California Fair Employment and Housing Act ("FEHA"). In addition, DFEH challenges the district court's finding of diversity jurisdiction under 28 U.S.C. § 1332 and Carauddo challenges the district court's denial of his motion to intervene. For the following reasons, we affirm.

*BACKGROUND*

Carauddo began working as a telecommunications installer ("installer") for Western Electric, Lucent's predecessor, in 1966. An installer's duties consist mostly of physical activities including running cable, drilling holes, setting frames, and wiring cell cabinets filled with electronic components. These activities require an installer to lift and maneuver various items often weighing over thirty pounds.

In January 2005, Carauddo suffered a back injury while performing his job and requested a paid sickness disability benefit period ("disability period") pursuant to Lucent's Sickness and Accident Disability Benefit Plan ("plan"). Lucent's plan requires a member of Lucent's medical department, usually a nurse, to communicate with the employee and his health care providers throughout the disability period. If an employee does not return to work after fifty-two weeks, he is terminated from Lucent's active payroll. An employee, however, may apply for an additional unpaid disability leave of absence if his prognosis is for a full recovery within six months. If an employee's health care provider disagrees with Lucent's decision, the employee may appeal to the Benefit

Claim and Appeal Committee within 180 days of the notice of termination.

Shortly after the commencement of Carauddo's disability period, one of Lucent's nurses, Karen Utermahlen, contacted him. In February 2005, Carauddo's physician, Theodore Yee, provided Utermahlen with a Healthcare Provider Report ("report") stating that Carauddo could return to work within three weeks, but could not climb, reach above shoulder level, or lift anything over twenty pounds. Utermahlen presented Carauddo's supervisors with this information, but they determined that no accommodation was available given these restrictions. In April 2005, Carauddo's new physician, Satish Sharma, informed Utermahlen that the previous restrictions specified by Yee needed to be continued. Utermahlen informed Carauddo's supervisors, but they determined that no accommodation was available. In May 2005, Sharma informed Utermahlen that Carauddo's work restrictions would continue until at least June. In August 2005, Carauddo's new physician, Tripta Sachdev, submitted an updated report to Utermahlen, indicating that Carauddo could not climb, twist, bend, stoop, reach above shoulder level, or lift anything above twenty pounds and suggested that he could be given a desk job. Utermahlen once again informed Carauddo's supervisors of these restrictions and they determined that no accommodation was feasible.

In October 2005, Sachdev provided Utermahlen with an updated list of restrictions that indicated Carauddo could not do repetitive bending, twisting, or lifting over twenty-five pounds. Utermahlen presented this information to Carauddo's supervisors, but they determined that no accommodation was possible. In November 2005, Carauddo's new health care provider, Allen Kaisler-Meza, prepared an updated report listing Carauddo's work restrictions as limited twisting and bending, and no lifting or carrying over ten pounds. In January 2006, Kaisler-Meza provided Utermahlen with a note stating that Carauddo was not allowed to lift, carry, push or pull an object

exceeding ten pounds and that these restrictions were to continue until his next examination scheduled for January 17, 2006. Utermahlen again contacted Carauddo's supervisors regarding available accommodations, but they determined that none were available given these restrictions.

On January 18, 2006, Utermahlen telephoned Carauddo to inquire as to the results of his latest examination, and he informed her that he had been released to work and could lift fifty pounds. On January 23, 2006, Utermahlen received an updated report from Kaisler-Meza, which was signed on January 17, 2006, indicating that Carauddo could return to work on January 25, 2006, and that he could "occasionally" lift or carry weights of twenty-one to fifty pounds. Upon receipt of this report, Utermahlen telephoned Carauddo and informed him that she could not return him to work without a further explanation from his physician and that she could not reach Kaisler-Meza.

On January 25, 2006, the final day of his disability period, Carauddo reported to work, but was informed by his supervisor that he could not return to active duty without approval by Lucent's Medical Department. On January 27, 2006, Lucent's Benefits Department sent Carauddo a letter informing him that his disability period had expired and that his employment was terminated effective January 25, 2006. On January 31, 2006, Carauddo underwent a scheduled functional capacity examination ("FCE") that determined he could lift up to forty-five pounds. In February 2006, however, Kaisler-Meza provided Utermahlen with updated work restrictions for Carauddo, stating that he could lift a maximum of thirty pounds. Utermahlen contacted Carauddo's supervisors with this updated information, but they again determined that no accommodation was feasible. In March 2006, Kaisler-Meza issued a report clearing Carauddo for unrestricted work, including the lifting of fifty pounds.

In June 2007, DFEH sued Lucent in California state court, claiming that Carauddo's termination violated the FEHA.

Lucent removed the lawsuit to federal court and DFEH moved to remand, but the district court concluded that it possessed diversity jurisdiction as Carauddo, not California, was the real party in interest. *Cal. Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, No. C073747PJH, 2007 U.S. Dist. LEXIS 77360, at *4-6 (N.D. Cal. Oct. 9, 2007) ("*Lucent I*"). Carauddo then moved for leave to intervene as a right, but the district court held that he could only permissively intervene on a limited basis. *Cal. Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, No. C073747PJH, 2008 U.S. Dist. LEXIS 10851, at *4-5 (N.D. Cal. Feb. 1, 2008) ("*Lucent II*").

In October 2008, Lucent moved for summary judgment. The district court held that Lucent did not violate the FEHA because the evidence demonstrated that Lucent communicated frequently with Carauddo during his disability period, that Lucent reasonably accommodated Carauddo, and that DFEH failed to establish that Lucent's legitimate reason for terminating him was merely pretextual. *Cal. Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, No. C073747PJH, 2008 U.S. Dist. LEXIS 98960, at *30, *35-36, *39-40 (N.D. Cal. Dec. 8, 2008) ("*Lucent III*"). DFEH and Carauddo now appeal.

## *STANDARD OF REVIEW*

"We review de novo a district court's determination that diversity jurisdiction exists." *Kroske v. U.S. Bank Corp.*, 432 F.3d 976, 979 (9th Cir. 2005) (internal quotation marks omitted). Similarly, "[w]e review de novo a district court's denial of a motion to intervene as of right." *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010). The denial of permissive intervention, however, is reviewed for abuse of discretion. *Perry v. Proposition 8 Official Proponents*, 587 F.3d 947, 955 (9th Cir. 2009)

"We review a district court's decision to grant summary judgment de novo." *Carver v. Holder*, 606 F.3d 690, 695 (9th Cir. 2010). "[W]e must determine, viewing the evidence in

the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Adkins v. Mireles*, 526 F.3d 531, 538 (9th Cir. 2008).

## *DISCUSSION*

### I.  Diversity Jurisdiction

At the outset, we will review the district court's determination that it possessed jurisdiction over this lawsuit. It remains clear that "[d]espite a federal trial court's threshold denial of a motion to remand, if, at the end of the day and case, a *jurisdictional* defect remains uncured, the judgment must be vacated." *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 76-77 (1996); *see also Ex parte Hoard*, 105 U.S. 578, 579 (1881). Nevertheless, "when there is no appeal of a denial of a remand motion . . . the issue on appeal is whether the federal court would have had jurisdiction had the case been filed in federal court in the posture it had at the time of the entry of the final judgment." *Carpenters Health & Welfare Trust Fund v. Tri Capital Corp.*, 25 F.3d 849, 852 (9th Cir. 1994) (quoting *Lewis v. Time, Inc.*, 710 F.2d 549, 552 (9th Cir. 1983), *overruled on other grounds*, *S. Cal. IBEW-NECA Trust Funds v. Std. Indus. Elec. Co.*, 247 F.3d 920 (9th Cir. 2001)); *see Caterpillar Inc.*, 519 U.S. at 76-77. Thus, we will consider whether diversity jurisdiction would have existed if the case had been filed in the posture it had at the time summary judgment was granted.

**[1]** "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States." 28 U.S.C. § 1332. For the purposes of diversity jurisdiction, "a State is not a citizen of itself." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 291 n.44 (1985); *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894). Thus, "neither a state nor a state agency [can] be a party to a diversity action." *Fifty Assocs. v. Prudential Ins. Co.*, 446 F.2d

1187, 1191 (9th Cir. 1970). Nevertheless, "the mere presence on the record of the state as a party plaintiff will not defeat the jurisdiction of the Federal court when it appears that the state has no real interest in the controversy." *Ex parte Nebraska*, 209 U.S. 436, 444 (1908). Specifically, the Supreme Court has provided that although "the State has a governmental interest in the welfare of all its citizens, in compelling obedience to the legal orders of all its officials, and in securing compliance with all its laws," these "general governmental interest[s]" will not satisfy the real party to the controversy requirement for the purposes of defeating diversity because "if that were so the state would be a party in interest in all litigation . . . ." *Mo., Kan. and Tex. Ry. Co. v. Hickman*, 183 U.S. 53, 60 (1901) ("*Missouri Railway*").[1] For this reason, a State's presence in a lawsuit will defeat jurisdiction under 28 U.S.C. § 1332(a)(1) only if "the relief sought is that which inures to it alone, and in its favor the judgment or decree, if for the plaintiff, will effectively operate."[2] *Id.* at 59;

---

[1] In *Missouri Railway*, the plaintiffs, citizens of Missouri who used a certain bridge, sued a railroad company, a citizen of Kansas, because it failed to comply with the railroad commissioner's rates and charges order. 183 U.S. at 58-59. The railroad company attempted to remove the lawsuit to federal court, as the requirements for diversity jurisdiction were satisfied, but the State retained the case, reasoning that the State of Missouri was the real party plaintiff. *Id.* The Supreme Court, however, reversed, holding that judgment would effectively operate in favor of only the individual plaintiffs, not the state. *Id.* at 59-60.

[2] DFEH contends that the district court's decision was in error because it ignored case law holding that a state's quasi-sovereign interest can render it a real party in the controversy. The concept of a quasi-sovereign interest is a judicial construct that provides a state with standing to bring forth a claim. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-601 (1982). Although the Supreme Court has never clearly defined what constitutes a quasi-sovereign interest, it does not include "sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party." *Id.* at 602. Rather, it "consist[s] of a set of interests that the State has in the well-being of its populace," which can include, for example, public nuisances and the economic well-being of its citizens. *Id.* at 602-05.

*Navarro Sav. Ass'n v. Lee*, 446 U.S. 458, 460 (1980) (" 'citizens' upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy"); *California ex rel. McColgan v. Bruce*, 129 F.2d 421, 423 (9th Cir. 1942). In making this determination, courts consider the substantive state law. *See Kuntz v. Lamar Corp.*, 385 F.3d 1177, 1183 (9th Cir. 2004).[3] Thus, we will consider what interest California has in this litigation pursuant to its laws.

---

Although the concept of a quasi-sovereign interest was originally developed in the context of standing to maintain an action, *see Missouri v. Illinois*, 180 U.S. 208, 241 (1901); *Louisiana v. Texas*, 176 U.S. 1, 19 (1900), some district courts have held that a decree will effectively operate in favor of a state so long as these interests are present, thus rendering the state a real party in interest for the purposes of diversity, *see Maine v. Data Gen. Corp.*, 697 F. Supp. 23, 25 (D. Me. 1988); *Dep't Fair Emp't Hous. v. Corrs. Corp. of Am.*, No. CVF091388LJODLB, 2009 U.S. Dist. LEXIS 114446, at *7-11 (E.D. Cal. Dec. 4, 2009); *Wisconsin v. Abbott Labs., Amgen, Inc.*, 341 F. Supp. 2d 1057, 1061-63 (W.D. Wis. 2004); *West Virginia v. Morgan Stanley & Co.*, 747 F. Supp. 332, 338-39 (S.D.W. Va. 1990); *Missouri ex rel. Webster v. Freedom Fin. Corp.*, 727 F. Supp. 1313, 1317-18 (W.D. Mo. 1989); *New York v. Gen. Motors Corp.*, 547 F. Supp. 703, 706-707 (S.D.N.Y. 1982). This use of quasi-sovereign interest to satisfy *Missouri Railway*'s unique relief requirement is contradictory to the very language of that opinion and has never been suggested or endorsed by the Supreme Court. *See Illinois v. SDS W. Corp.*, 640 F. Supp. 2d 1047, 1051-52 (C.D. Ill. 2009). Furthermore, other circuit courts have declined such an understanding, as it would effectively render *Missouri Railway* moribund. *See Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 261-63 (4th Cir. 2005); *District of Columbia ex rel. Am. Combustion, Inc. v. Transamerica Ins. Co.*, 797 F.2d 1041, 1047 (D.C. Cir. 1986).

[3]Although this approach originally developed under a Rule 17(a) analysis, *see Allstate Ins. Co. v. Hughes*, 358 F.3d 1089, 1093-94 (9th Cir. 2004) (considering substantive state law for purposes of Fed. R. Civ. P. 17(a)) the Ninth Circuit has also used it when considering diversity, *see Kuntz*, 385 F.3d at 1183 (considering substantive state law when making a diversity determination); see also, *Navarro Sav. Ass'n*, 446 U.S. at 462-63 n.9 ("There is a 'rough symmetry' between the real party in interest standard of *Rule 17(a)* and the rule that diversity jurisdiction depends upon the citizenship of real parties to the controversy. But the two rules serve different purposes and need not produce identical outcomes in all cases.").

## A. Cal. Gov't Code § 12920

**[2]** DFEH contends that it is a real party in the controversy for the purposes of diversity jurisdiction because the statute itself states that California has its own interest in such litigation. The relevant statutory language provides that "it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination" because "the practice of denying employment opportunity and discriminating in the terms of employment . . . foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interest of employees, employers, and the public in general," and is "against public policy." Cal. Gov't Code § 12920.

**[3]** Although there is little doubt that this provision supports a finding that California is a real party in interest for the purposes of a standing, *see EEOC v. United Parcel Serv.*, 860 F.2d 372, 374 (10th Cir. 1988), this language fails to render it a real party in the controversy for the purposes of diversity jurisdiction because these articulated interests are the very "general governmental interest[s]" that the Supreme Court has stated cannot satisfy the diversity requirement,[4] *see Missouri Railway*, 183 U.S. at 60.[5] Indeed, the statute itself supports

---

[4]Although the FEHA enables California to bring a lawsuit and therefore, arguably control the course of litigation, *see Atchison, T. & S.F. Ry. Co. v Phillips*, 176 F. 663, (9th Cir. 1910) (providing that private parties are "interested" if "they have some control over the action, whether they will be personally affected thereby or not"), control alone cannot render California a real party in interest because a state can always bestow upon itself control over virtually any lawsuit via legislation, *see Missouri Railway*, 183 U.S. at 60.

[5]It seems logical that a state can possess standing to bring forth a claim, but lack status as a real party in the controversy for the purposes of diversity jurisdiction, as the categories that satisfy the latter are more limited than those of the prior. *Compare Alfred L. Snapp & Son, Inc.*, 458 U.S. at 600-02 (a state is a real party in interest if it possesses a sovereign,

this conclusion, providing that this legislation "shall be deemed an exercise of the *police power of the state* for the protection of the welfare, health, and peace of the people of this state."[6] Cal. Gov't Code § 12920 (emphasis added). Additionally, the language of the FEHA supports a conclusion that any judgment will effectively operate in favor of the person claiming to be aggrieved. *See* Cal. Gov't Code § 12965(c)(2) (stating that "the person claiming to be aggrieved shall be the real party in interest"[7]).

## B.   Equitable Relief

Next, DFEH argues that it is a real party in the controversy for the purposes of diversity jurisdiction because it sought

---

quasi-sovereign, or a proprietary interest), *with Missouri Railway*, 183 U.S. at 60 (a state's presence in a lawsuit will only defeat diversity jurisdiction if that state possesses an interest as an "artificial person"). Any district courts that have held to the contrary are incorrect. *See, e.g.*, *Gen. Motor Corp.*, 547 F. Supp. at 705-06 n.5 (reasoning that "[i]nherent in the conclusion that a state has standing to sue as parens patriae is the conclusion that the state has a quasi-sovereign interest in the controversy independent of the interests of individual citizens").

[6]Furthermore, the state cannot possess the ability to defeat federal jurisdiction under 28 U.S.C. § 1332(a)(1), over an action between what would otherwise be two diverse citizens, merely by enacting legislation pursuant to its police powers. *See Missouri Railway*, 183 U.S. at 60 (providing that if such a proposition were true, a state could defeat federal jurisdiction in all litigation brought pursuant to its laws).

[7]Although this statutory language is helpful in analyzing the State's interest under the substantive law, *see Glacier Gen. Assurance Co. v. G. Gordon Symons Co.*, 631 F.2d 131, 133-34 (9th Cir. 1980) (providing that "[t]he identity of the real party in interest . . . depends on the legal relationships of the parties under applicable substantive law"), its pronouncement of the real party in interest is not binding on courts for the purposes of diversity jurisdiction, *see Allstate*, 358 F.3d at 1094 (providing that "[t]he forum state's procedural statute or rule defining the real party in interest concept is not applicable . . . the federal courts are concerned only with that portion of state law from which the specific right being sued upon stems" (citation and emphasis omitted)).

equitable relief. In its prayer for relief, DFEH asked the court to order Lucent to 1) "cease and desist from discriminating against Real Party and other employees on the basis of physical or mental disability;" 2) "develop, implement, and disseminate a policy that clearly advises management and supervisors of their obligation[s] under the FEHA;" 3) "train all management-level employees, and all supervisors in the chain of command, regarding [Lucent's] duties" under the FEHA; and 4) "post an order in a conspicuous place in all work locations that dispatch Installers in the State of California, stating that Defendant has been found in violation of the FEHA, and specifying the remedies ordered." ER 671.

**[4]** DFEH's claim that these equitable remedies constitute a substantial state interest is unavailing, as most of these forms of equitable relief could be obtained by the individual aggrieved. In fact, Carauddo's prayer for relief includes a request "[f]or a permanent and mandatory injunction prohibiting Defendants from committing future violations of the laws and public policies" of the FEHA. ER 646. Any remaining interests that are unique to DFEH's lawsuit, namely the training of Lucent's employees, are tangential to the alleged relief sought for Carauddo and, thus, cannot render DFEH a real party to the controversy under these circumstances.[8] *See Geeslin v. Merriman*, 527 F.2d 452, 455 (6th Cir. 1975) (providing that "[t]he question as to whether or not the state is the real party in interest must be determined by the essential nature and effect of the proceeding as it appears from the entire record" (internal quotation marks omitted)).

---

[8]In its prayer for relief, DFEH first asked the court to order Lucent to 1) reinstate Carauddo to his installer position or "pay his back pay, front pay, and other benefits of employment . . . with interest at the applicable legal rate"; 2) pay the "Real Party damages for his emotional distress, nervous pain, and suffering"; and 3) pay Carauddo punitive damages. ER 670. It is clear that these forms of relief are for the benefit of Carauddo, and therefore, cannot support a finding that DFEH is a real party plaintiff for the purposes of diversity jurisdiction. *See Missouri Railway*, 183 U.S. at 59.

**[5]** For these reasons, the statutory scheme does not support a finding that DFEH is a real party in the controversy for the purposes of diversity jurisdiction. Accordingly, the district court correctly determined that it possessed jurisdiction.[9] *See Lucent I*, 2007 U.S. Dist. LEXIS 77360, at *4-6.

## II.  Intervention

### A.  Right to Intervene

**[6]** An applicant has a right to intervene if he "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). The Ninth Circuit has provided that in order for an applicant to intervene, as a right:

> (1) [T]he application for intervention must be timely; (2) the applicant must have a significantly protectable interest relating to the property or transaction that is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by the existing parties in the lawsuit.

*DBSI/TRI IV Ltd. v. United States*, 465 F.3d 1031, 1037 (9th Cir. 2006) (internal quotation marks omitted).[10]

---

[9]The district court concluded that the amount in controversy exceeds the $75,000 statutory requirement. *Lucent I*, 2007 U.S. Dist. LEXIS 77360, at *6. Neither party contests this determination.

[10]Fed. R. Civ. P. 24(a)(1) recognizes the unconditional right to intervene when such is provided by federal statute. This subsection does not apply here.

Both parties agree that the first three prongs of this test were satisfied in this case. Carauddo claims that he also satisfied the fourth prong because he was inadequately represented. He asserts that DFEH "litigate[s] in order to further the societal goal of ending discrimination, without regard to whether the result is the most advantageous that could be achieved on behalf of the individual victim." This claim lacks merit.

[7] "In the absence of a very compelling showing to the contrary, it will be presumed that a state adequately represents its citizens when the applicant shares the same interest." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (internal quotation marks omitted). "[M]ere [ ] differences in [litigation] strategy . . . are not enough to justify intervention as a matter of right." *Perry*, 587 F.3d at 954 (internal quotation marks omitted). Carauddo's vague speculation falls far short of a "very compelling showing."[11] *California ex rel. Lockyer v. United States*, 450 F.3d 436, 443-44 (9th Cir. 2006) (holding that an applicant "must demonstrate a likelihood that the government will abandon or concede a potentially meritorious" position).

[8] Nor does public policy support Carauddo's unconditional right to intervene. Although the FEHA provides that in employment discrimination cases brought by DFEH, "the person claiming to be aggrieved shall be the real party in interest and shall have the right to participate as a party and be represented by his or her own counsel," Cal. Gov't Code § 12965(c)(2), state law cannot negate the requirement of the federal rule that Carauddo demonstrate that he is not ade-

---

[11]This finding is further supported by the discussion in the previous section. *See*, *supra* Sect. (I)(B)(i). Arguably, if these parties sought drastically different remedies, there would be a greater risk of inadequate representation. See *Pub. Serv. Co. of N.H. v. Patch*, 136 F.3d 197, 209 (1st Cir. 1998) (petitioner lacks right to intervene where "no divergence of interest between the two bodies in respect to the causes of action pleaded"). This, however, is not the case.

quately represented by California, *see Patch*, 136 F.3d at 208 (providing that "[a] state statute can inform the *Rule 24(a)(2)* calculus, but it cannot displace the requirement that a would-be intervenor satisfy each of the rule's prerequisites").[12] As Carauddo has failed to make such a showing, the district court's denial of his motion to intervene as a right was not in error.

## B. Permissive Intervention

Although the district court denied Carauddo's motion to intervene as a right, it allowed him to intervene permissibly pursuant to Fed. R. Civ. P. 24(b). *Lucent II*, 2008 U.S. Dist. LEXIS 10851, at *4-5. The district court stated that:

> First, Mr. Carauddo may file motions or oppositions to motions only as to those claims not asserted by DFEH. That is, there shall be no duplicative motions or oppositions. Second, all discovery must be shared. There shall be no discovery propounded by Mr. Carauddo that duplicates discovery propounded by DFEH. Third, the court will not approve any request for attorney's fees for duplicative work performed by Mr. Carauddo's counsel, or for any work on the claims brought by DFEH.

*Id.* at *5. Carauddo claims that these limitations were unreasonable. This claim lacks merit.

[9] Under Fed. R. Civ. P. 24(b), "the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). When making this discretionary determina-

---

[12]Carauddo also argues that he would have been entitled to intervene if the Equal Employment Opportunity Commission had filed an ADA claim in federal court. 42 U.S.C. § 2000e-5(f)(1). Such a consideration, however, is irrelevant as no ADA claims are alleged.

tion, a district court "must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). "The district court's discretion . . . under Rule 24(b), to grant or deny an application for permissive intervention includes discretion to limit intervention to particular issues." *Van Hoomissen v. Xerox Corp.*, 497 F.2d 180, 181 (9th Cir. 1974); *see Columbus-Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 974 F.2d 450, 469 (4th Cir. 1992) (providing that "[w]hen granting an application for permissive intervention, a federal district court is able to impose almost any condition")*; Beauregard, Inc. v. Sword Servs. LLC*, 107 F.3d 351, 352-53 (5th Cir. 1997).

**[10]** Carauddo first argues that the district court denied him representation when it prohibited his counsel from making any argument regarding DFEH's claims at the summary judgment hearing. As previously discussed, however, Carauddo was adequately represented by DFEH on these claims. *See Arakaki*, 324 F.3d at 1086. It was reasonable, therefore, for the district court to limit Carauddo's intervention in this regard. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 380 (1987) (providing that "in a complex case . . . a district judge's decision on how best to balance the rights of the parties against the need to keep the litigation from becoming unmanageable is entitled to great deference"); *Spangler v. Pasadena City Bd. of Educ.*, 552 F.2d 1326 (9th Cir. 1977) (providing that a district court may consider factors including adequate representation and whether an applicant will significantly contribute); *see also AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 561-62 (2nd Cir. 2005) (providing that "[a] denial of permissive intervention has virtually never been reversed" because of the considerable discretion afforded to district courts).

**[11]** Next, Carauddo argues that it was unreasonable for the district court to preemptively limit attorneys' fees. The preemptive nature of this ruling, however, does not render it unreasonable, as a court may deny a plaintiff-intervenor attor-

ney's fees in a civil rights action if "they played a de minimis role." *Seattle Sch. Dist. No. 1 v. Washington*, 633 F.2d 1338, 1349 (9th Cir. 1980); *see Grove v. Mead Sch. Dist. No. 354*, 753 F.2d 1528, 1535 (9th Cir. 1985) ("Awards to intervenors should not be granted unless the intervenor plays a significant role in the litigation.").

The district court did not abuse its discretion in placing various limitations on Carauddo as an intervenor.

## III.   The FEHA[13]

### A.   Failure to Interact

DFEH appeals the district court's conclusion that Lucent's interaction with Carauddo was sufficient under California law. *Lucent III*, 2008 U.S. Dist. LEXIS 98960, at \*39-40. For the following reasons, we agree with the district court.

**[12]** Under the FEHA,[14] "[i]t is an unlawful employment practice . . . [f]or an employer . . . to fail to engage in a timely, good faith, interactive process with the employee . . . to deter-

---

[13]Although Carauddo's only substantive claim on appeal is his common law claim of wrongful termination, we will consider the substance of his arguments regarding the FEHA, as his wrongful termination claim is entirely reliant on a finding of discrimination under the FEHA. *See Lucent III*, U.S. Dist. LEXIS 98960, at \*40-42.

[14]"[F]ederal courts sitting in diversity jurisdiction apply state substantive law and federal procedural law." *Zamani v. Carnes*, 491 F.3d 990, 995 (9th Cir. 2007) (internal quotation marks omitted). "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying [its] own statutes." *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1113 (Cal. 2000). Nevertheless, "because FEHA provides protections independent from those in the [ADA] and afford[s] additional protections [than thereof, the ADA] . . . state law will part ways with federal law in order to advance the legislative goal of providing greater protection to employees than the ADA." *Gelfo v. Lockheed Martin Corp.*, 43 Cal. Rptr. 3d 874, 892 (Cal. Ct. App. 2006) (internal quotation marks and citations omitted).

mine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability." Cal. Gov't Code § 12940(n). "[T]he interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees with the goal of identify[ing] an accommodation that allows the employee to perform the job effectively." *Nadaf-Rahrov v. Neiman Marcus Grp., Inc.*, 83 Cal. Rptr. 3d 190, 219 (Cal. Ct. App. 2008) (internal quotation marks omitted).

**[13]** During Carauddo's disability period, he was in contact with at least two Lucent employees, Utermahlen and his immediate supervisor, Claudine Strange, yet failed to bring to Lucent's attention any possible accommodations that it had not considered. Any failure to interact adequately, therefore, was caused by Carauddo and, as a result, Lucent cannot be held liable. *See Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1115 (9th Cir. 2000) ("[C]ourts should attempt to isolate the cause of the breakdown [in the interactive process] and then assign responsibility so that liability . . . ensues only where the employer bears responsibility for the breakdown." (internal quotation marks omitted)), *rev'd on other grounds*, 535 U.S. 391 (2002). Thus, this undisputed evidence fails to raise a genuine issue of material fact as to DFEH's failure to interact claim.[15]

---

[15]Although Carauddo did not participate in any of Lucent's internal conversation regarding available accommodation, this does not render Lucent in violation of the FEHA, as Carauddo never expressed a desire to return to work with accommodation. *See Barnett*, 228 F.3d at 1115. Furthermore, the law affords employers the ability to have some internal discussion. *See id.* ("The interactive process requires that employers analyze job functions to establish the essential and nonessential job tasks.").

## B. Reasonable Accommodation

DFEH appeals the district court's decision to grant summary judgment to Lucent on DFEH's reasonable accommodation claim, arguing there was a genuine issue of material fact as to whether Lucent failed to reasonably accommodate Carauddo. *Lucent III*, 2008 U.S. Dist. LEXIS 98960, at *34-36. For the following reasons, we agree with the district court.

**[14]** Pursuant to the FEHA, it is unlawful "[f]or an employer . . . to fail to make reasonable accommodation for the known physical . . . disability of an . . . employee." Cal. Gov't Code § 12940(m). An employer, however, is not required to provide "an accommodation that is demonstrated by the employer . . . to produce undue hardship to its operation." *Id.* "Reasonable accommodation may include either . . . [m]aking existing facilities used by employees readily accessible to, and usable by, individuals with disabilities" or "[j]ob restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." Cal. Gov't Code § 12926(n). An "employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts" that "reasonable accommodation was offered and refused," that "there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation," or that "the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." *Jensen v. Wells Fargo Bank*, 102 Cal. Rptr. 2d 55, 68 (Cal. Ct. App. 2000).[16]

---

[16]It is clear that California law affords Carauddo a right to a reasonable accommodation, regardless of whether he specifically sought it. *See Hum-*

[15] The essential functions of the installer position included "frequently" lifting up to thirty pounds from waist to overhead, "occasionally" lifting up to fifty pounds from floor to waist, and "frequently" carrying up to fifty pounds for as long as one hundred feet.[17] ER 516. When Carauddo was no longer physically able to perform these functions,[18] Lucent's plan afforded him a disability period to rehabilitate.[19] *See Hanson v. Lucky Stores, Inc.*, 87 Cal. Rptr. 2d 487, 494 (Cal. Ct. App. 1999) (holding that "a finite leave of absence has been considered to be a reasonable accommodation under

---

*phrey v. Mem'l Hosp. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("[o]nce an employer becomes aware of the need for accommodation, that employer has a mandatory obligation . . . to engage in an interactive process with the employee to identify and implement appropriate reasonable accommodations").

[17]Lucent's functional job description defines "occasionally" as constituting "6-33% of the time in an 8 hour work day," "frequently" as constituting "34-66% of the time in an 8 hour work day," and "continuously" as constituting "67-100% of the time in an 8 hour work day." ER 516.

[18]Lucent's written job description, supported by numerous employee accounts, can be relied upon to establish the essential functions of the installer position, regardless of what Carauddo's individual experience in that position may have entailed. *See Dark v. Curry Cnty.*, 451 F.3d 1078, 1087 (9th Cir. 2006) (providing that "consideration shall be given to the employer's judgment as to what functions of the job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job" (internal quotation marks omitted)).

[19]If Lucent had done nothing other than provide Carauddo with a paid leave of absence, it is likely that Lucent would have violated Cal. Gov't Code § 12940(m) because it would have failed to consider other possibilities such as job restructuring, modification of equipment, and reassignment. *See Jensen*, 102 Cal. Rptr. 2d at 68 (a leave of absence is a reasonable accommodation only if "the employee will be able to return to an existing position at some time in the foreseeable future"); Cal. Gov't Code §§ 12926(n). During Carauddo's disability period, however, the evidence shows that Lucent attempted, without success, to further accommodate him, as indicated in the text.

ADA, provided it is likely that following the leave the employee would be able to perform his or her duties"); *Jensen*, 102 Cal. Rptr. 2d at 68. During this time, Lucent repeatedly considered whether Carauddo could perform the tasks of an installer given his physical restrictions or alternatively be placed in another position, but it determined that he could not.[20] Lucent was not required to do more under California law, such as modifying the installer position or extending the disability period indefinitely. *See Dark*, 451 F.3d at 1089 (providing that reasonable accommodation "does not require an employer to exempt an employee from performing essential functions or to reallocate essential functions to other employees"); *Hanson*, 87 Cal. Rptr. 2d at 494 (providing that an employer's duty to reasonably accommodate a disabled employee "does not require the employer to wait indefinitely for an employee's medical condition to be corrected" (internal quotation marks omitted)); *Nadaf-Rahrov*, 83 Cal. Rptr. 3d at 222. Furthermore, as previously discussed, Carauddo failed to engage in or seek to be included in any discussion regarding what accommodations were available. Thus, as a matter of law, the undisputed evidence cannot support a finding that Lucent failed to provide Carauddo with a reasonable accommodation.[21]

---

[20]The question of whether an alternative position was available frequently raises a genuine issue of material fact in reasonable accommodation cases. *See Spitzer v. Good Guys, Inc.*, 96 Cal. Rptr. 2d 236, 246 (Cal. Ct. App. 2000). Neither DFEH nor Carauddo, however, raise this claim.

[21]Although there is evidence that certain devices, such as dowels, dollies, Masonite, hoists, crowbars, and drift pins, were used by installers to alleviate lifting the heaviest weights, the same evidence shows that these tools did not eliminate all of the strenuous lifting. For instance, it is clear that installers had to tip heavy frames back in order to slide an assistive device underneath. In addition, even with the assistance of the such devices, installers had to manually maneuver heavy frames in order to "muscle [them] into place." ER 281:4. The evidence also shows that battery hoists could be used to move heavy batteries, but these devices were limited to specific objects and certain locations. These tools, therefore, could not eliminate all lifting requirements from the installer position. Fur-

## C. Disability Discrimination

DFEH next challenges the district court's decision to grant summary judgment to Lucent on DFEH's disability discrimination claim, arguing, inter alia, that genuine issues of material fact exist as to pretext. *Lucent III*, 2008 U.S. Dist. LEXIS 98960, at *34-36. For the following reasons, we affirm.

[16] "The FEHA prohibits discrimination against any person with a disability but, like the ADA, provides that the law allows the employer to discharge an employee with a physical disability when that employee is unable to perform the essential duties of the job even with reasonable accommodation." *Green v. California*, 165 P.3d 118, 119 (Cal. 2007); *see* Cal. Gov't Code § 12940(a)(1). "California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination . . . based on a theory of disparate treatment" because "such claims must usually be proved circumstantially."[22] *Guz*, 8 P.3d at 1113. *Generally*, "the plaintiff [has] an initial burden of establishing a prima facie case of discrimination." *Godwin*, 150 F.3d at 1220. When an employer moves for summary judgment, however, "the burden is reversed . . . because the defendant who seeks summary judgment bears the initial burden." *Hanson*, 87 Cal. Rptr. 2d at 493 (internal quotation marks omitted). Thus, "[t]o prevail on summary judgment, [the employer is]

thermore, some of the very devices that DFEH claims could have accommodated Carauddo are listed as equipment used to perform the installer job by the same functional job description that described the fifty pound lifting and carrying requirements. This evidence shows that the lifting and carrying requirements of the installer position contemplated these assistive tools.

[22]The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), framework is applicable in this case because there is no evidence that "proves the fact [of discriminatory animus] without inference or presumption." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (internal quotation marks omitted).

required to show either that (1) plaintiff could not establish one of the elements of [the] FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment." *Avila v. Cont'l Airlines, Inc.*, 82 Cal. Rptr. 3d 440, 449 (Cal. Ct. App. 2008).

### i.   *Legitimate, Nondiscriminatory Reason*

To demonstrate a legitimate, nondiscriminatory reason for its decision to terminate Carauddo, Lucent "must show that the procedure by which [he] was terminated was validly and fairly devised and administered to serve a legitimate business purpose." *Hanson*, 87 Cal. Rptr. 2d at 492 (internal quotation marks omitted). Under the FEHA, employers are afforded an inability to perform defense. *See Green*, 165 P.3d at 125; Cal. Code Regs. tit. 2, § 7293.8(b). Specifically, the FEHA provides:

> This part does not prohibit an employer from . . . discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from . . . the discharge of an employee with a physical or mental disability, where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.

Cal. Gov't Code § 12940(a)(1).

**[17]** As previously discussed, there is no genuine issue of material fact as to Carauddo's inability to perform the essential functions of the installer position, and Lucent's inability to reasonably accommodate him.[23] This same evidence estab-

---

[23]The undisputed facts establish that Carauddo was not cleared by his doctor to perform the essential functions of the installer position because

lishes a legitimate, nondiscriminatory reason for Carauddo's termination. *See* Cal. Gov't Code § 12940(a)(1). Thus, the burden shifts to DFEH to show pretext.

### ii. *Pretext*

**[18]** "Once the employer makes a sufficient showing . . . then the discharged employee seeking to avert summary judgment must . . . demonstrate either . . . that the defendant's showing was in fact insufficient or . . . that there was a triable issue of fact material to the defendant's showing." *Hanson*, 87 Cal. Rptr. 2d at 493 (internal quotation marks omitted). The employee can satisfy its burden by "produc[ing] substantial responsive evidence that the employer's showing was untrue or pretextual." *Id.* (internal quotation marks omitted). A "plaintiff may establish pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Godwin*, 150 F.3d at 1220 (internal quotation marks omitted). If a plaintiff uses circumstantial evidence to satisfy this burden, such evidence "must be specific" and "substantial." *Id.* at 1221. "An employee in this situation can not simply show the employer's decision was wrong, mistaken, or unwise." *Morgan v. Regents of the Univ. of Cal.*, 105 Cal. Rptr. 2d 652, 670 (Cal. Ct. App. 2000) (internal quotation marks omitted). "Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence . . . and hence infer that the employer did not act for

---

Dr. Kaisler-Meza's January 2006 report only released Carauddo to spend a maximum of thirty-five percent of his day lifting or carrying between twenty-one and fifty pounds, whereas, an installer is required to carry up to fifty pounds for up to sixty-six percent of the day. Even in February, he was cleared to lift a maximum of only thirty pounds.

the . . . non-discriminatory reasons." *Id.* (internal quotation marks, emphasis, and citation omitted).[24]

First, DFEH argues that Lucent increased the lifting and carrying requirements for the installer position to one-hundred pounds when it was informed that Carauddo could lift and carry fifty pounds. The evidence shows that sometime during Carauddo's disability period, Lucent's Director of Operations for installation in the United States, Christopher Camacho, created an Occupational Requirements form ("the form") for the installer position. The form indicated that installers were required to frequently lift and carry weights between fifty and one-hundred pounds, and occasionally lift and carry weights exceeding one-hundred pounds. This one-hundred pound requirement from the form is inconsistent with the official job description, and Camacho himself refers to only a fifty pound requirement in his October 2008 declaration. Furthermore, as previously discussed, the record is clear that at no time before Carauddo's termination in January 2006 did any of his doctors clear him to perform the essential functions of the installer position as described by Lucent's official job description. Any evidence of a one-hundred pound requirement therefore is inconsequential, as at the time of his termination Carauddo was not demonstrated to be physically capable of frequently carrying weights up to fifty pounds for one-hundred feet.

Next, DFEH and Carauddo argue that Lucent's skepticism about Carauddo's ability to lift fifty pounds is evidence of pretext. This argument, however, lacks merit because the evidence most favorable to Carauddo shows that in January he was released to work with certain restrictions, including only occasionally carrying amounts up to fifty pounds. The job description, however, required "frequent" carries of fifty

---

[24]Although DFEH failed to argue pretext before the district court, we will consider pretext because the allegation of a "discriminatory animus" was raised below. *See Morgan*, 105 Cal. Rptr. 2d at 670.

pounds. His post-termination FCE and doctor report were even more limited.

**[19]** DFEH and Carauddo also argue that the circumstances surrounding the scheduling of Carauddo's FCE raise a genuine issue of material fact. Carauddo additionally argues that Lucent's failure to consider the results of the FCE could establish a pretext. The evidence suggests that Utermahlen originally requested an FCE for Carauddo on January 20, 2006, but cancelled this request three days later. On January 31, 2006, six days after his termination, Carauddo underwent a scheduled FCE and was cleared to return to work, but with various hour restrictions below that required of an installer. Furthermore, fatigue prevented Carauddo from physically demonstrating that he could lift or carry fifty pounds at the FCE. The scheduling of the FCE, therefore, fails to raise a genuine issue of material fact as to pretext, as it did not show that Carauddo could perform the essential functions of the installer position.

**[20]** Additionally, DFEH and Carauddo argue that Lucent has a one-hundred percent healed policy and that this raises a genuine issue of material fact as to pretext. Although Utermahlen informed Carauddo's wife that he "must be one-hundred percent to return to gainful employment" and Lucent's policy provides disabled employees with an additional six months of unpaid leave only if their "prognosis for full recovery is within six months of the expiration of [their] sickness disability benefits," this evidence does not establish pretext because here the undisputed facts demonstrate that Lucent attempted to accommodate him by continually assessing him on an individual basis. ER 354, 441; *see Gelfo*, 43 Cal. Rptr. 3d at 886 n.11 (a "policy requiring an employee be '100 percent healed' before returning to work is a per se violation" when the employer does not make an individualized assessment of whether the employee can perform essential functions of position with accommodation). This evidence, therefore, does not raise a genuine issue of material fact.

**[21]** DFEH's contention that Lucent's continual reference to the degenerative nature of Carauddo's disability establishes a pretext is similarly unavailing. DFEH cites evidence that Utermahlen characterized Carauddo's condition as a "multilevel disc disease, in itself . . . a long term condition, which includes physical limitations," ER 357, "degenerative in nature," ER 358, and a "multi level disc disease," ER 357. Utermahlen also characterized Carauddo's ability to lift fifty pounds as a "miracle recovery." ER 519. Indeed the January "occasional"-fifty-pounds assessment did not hold. In any case, this fleeting evidence does not establish a pretext because it is ambiguous and insubstantial. *See Godwin*, 150 F.3d at 1221.

**[22]** Finally, Carauddo argues that Lucent's failure to provide him with an additional six months of leave pursuant to its policy established pretext. Lucent informed Carauddo of his right to apply for an additional six month leave of absence, but he failed to do so. Thus, this evidence does not raise a genuine issue of material fact as to pretext.

For the aforementioned reasons, DFEH has failed to raise a genuine issue of material fact as to pretext. Accordingly, the district court's grant of summary judgment was not in error.

### D. Unlawful Failure to Take All Reasonable Steps Necessary to Prevent Discrimination

The district court granted Lucent summary judgment on DFEH's claim that Lucent unlawfully failed to take all reasonable steps necessary to prevent discrimination because there was no viable claim for discrimination. *Lucent III*, 2008 U.S. Dist. LEXIS 98960, at *41. We affirm.

**[23]** Under the FEHA, it is unlawful "[f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." Cal. Gov't Code § 12940(k). The California courts have held that this subsec-

tion is a separate unlawful employment practice. *Carter v. Cal. Dept. of Veterans Affairs*, 135 P.3d 637, 645 n.4 (Cal. 2006). Nevertheless, employers are not liable for failing to take necessary steps to prevent discrimination, "except where the [discriminatory] actions took place and were not prevented." *Trujillo v. N. Cnty. Transit Dist.*, 73 Cal. Rptr. 2d 596, 602 (Cal. Ct. App. 1998); *see Carter*, 135 P.3d at 645 n.4. DFEH, therefore, cannot prevail on this claim because the evidence does not show that Lucent discriminated against Carauddo. Accordingly, the district court's grant of summary judgment on this claim was not in error.

## IV.    Wrongful Termination in Violation of Public Policy

The district court held that no genuine issue of material fact existed as to Carauddo's wrongful termination claim because DFEH could not prevail on any of its claims under the FEHA. *Lucent III*, 2008 U.S. Dist. LEXIS 98960, at *42. We affirm.

**[24]** Under California common law, although "an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." *Silo v. CHW Med. Found.*, 45 P.3d 1162, 1166 (Cal. 2002) (internal quotation marks omitted). Nevertheless, "[t]his public policy exception to the at-will employment rule must be based on policies carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions." *Id.* at 1166 (internal quotation marks omitted). The elements for this tort are (1) the existence of a public policy and (2) a nexus between the public policy and an employee's termination. *See Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1034 (Cal. 1994). Although "disability discrimination can form the basis of a common law wrongful discharge claim," *City of Moorpark v. Superior Court*, 959 P.2d 752, 763 (Cal. 1998), there are no genuine issues of material fact remaining as to any of DFEH's disability discrimination

claims. The district court's determination that Carauddo could not prevail on this cause of action, therefore, was correct.

## *CONCLUSION*

For the foregoing reasons, the district court was correct to deny DFEH's motion to remand and Carauddo's motion to intervene as a right. Furthermore, the permissive intervention allowed was not improperly restrained and there is no genuine issue of material fact as to any of DFEH or Carauddo's claims. Accordingly, the district court's orders and grant of summary judgment are affirmed.

AFFIRMED.

---

IKUTA, Circuit Judge, dissenting:

The majority today purports to overrule longstanding Ninth Circuit precedent that is, quite literally, hornbook law: a party is an interested party for purposes of diversity jurisdiction when it has some control over the litigation. *See* Wright & Miller, *Federal Practice & Procedure* § 1556 (3d ed.) (citing *Atchison, T. & S.F. Ry. Co. v. Phillips*, 176 F. 663 (9th Cir. 1910)). Based on this binding precedent, we must dismiss for lack of jurisdiction. I respectfully dissent.

### I

The crucial question for jurisdiction in this case is whether the Department of Fair Employment and Housing (DFEH), a California agency, constitutes a party to this action for purposes of diversity jurisdiction. If DFEH is an interested party, then complete diversity is lacking, because DFEH is equivalent to the state and a state cannot be a citizen of itself. *See Moor v. Alameda Cnty.*, 311 U.S. 693, 717 (1973).

## A

The answer to this question is established by long-standing precedent. Federal courts have diversity jurisdiction over controversies "between citizens of different states." U.S. Const. art. III, § 2, cl. 1. As a general rule, when jurisdiction depends on the party, the Court determines jurisdiction based on the party named in the record. *Mo., Kan. & Tex. Ry. Co. v. Hickman* (hereinafter *Missouri Railway*), 183 U.S. 53, 54 (1901) (citing *Osborn v. Bank of United States*, 22 U.S. (I Wheat.) 738 (1824)).

Notwithstanding this general rule, under rare circumstances the presence of a non-diverse party on the record will not destroy diversity. In *Walden v. Skinner*, the Supreme Court explained that although the beneficiary of a trust had named the trust's executors as defendants in an action to obtain title to trust property, the executors' citizenship did not count for determining diversity jurisdiction because they had no "interest in or control over" the lawsuit and their only role "was to perform the ministerial act of conveying the title if adjudged to the complainant." 101 U.S. 577, 589 (1894). And in *Ex parte Nebraska*, the Court reaffirmed that "the mere presence on the record of the state as a party plaintiff will not defeat the jurisdiction of the Federal court when it appears that the state has no real interest in the controversy." 209 U.S. 436, 444 (1908).

Although the majority relies heavily on *Missouri Railway*, that case addressed a different issue: whether the state of Missouri was a real party in interest despite not being a party of record. 183 U.S. at 58. The Court noted that even when a state is not a named party, the state may still be a real party in interest "when the relief sought is that which inures to it alone, and in its favor the judgment or decree, if for the plaintiff, will effectively operate." *Id.* at 59. Nevertheless, the Court held that this exception was inapplicable in the case before it, because the state did not have any "direct, pecuniary

interest in the result of the litigation," and the state's general interest in "the welfare of all its citizens, in compelling obedience to the legal orders of all its officials, and in securing compliance with all its laws," was too remote. *Id.* at 60.

The Court further clarified its test for determining when a party of record is a real party for jurisdictional purposes in *United States Fidelity & Guaranty Company v. United States*, 204 U.S. 349 (1907). In that case, a material man[1] employed on a federal construction project brought an action to recover on a payment bond, pursuant to a statute that required the material man to bring suit in the name of the United States. *Id.* at 354. The defendant challenged federal jurisdiction on the ground that the United States was a nominal party and there was no other basis for federal jurisdiction. *Id.* The Court disagreed, holding that the United States was not "merely [a ]nominal or formal party" even though only the persons who supplied labor or materials "will get the benefit of the judgment" because the United States was a party to the underlying construction contract and had an interest in enforcing the contract on behalf of the material man. *Id.* at 356-57. In short, even though the United States received no immediate monetary benefit from the suit, it was a party to the case for jurisdictional purposes.

## B

From these Supreme Court cases and others, we distilled our own approach. *See Atchison*, 176 F. 663. In *Atchison*, we considered a wrongful death action brought by a surviving spouse against a railway company. *Id.* at 664-65. In order to establish that she was the sole beneficiary of her husband's estate, the plaintiff named her husband's parents as defendants. *Id.* at 665. The railway company claimed that the fed-

---

[1]A material man is the person who supplies materials required for a construction project.

eral court lacked jurisdiction, because the parents and spouse were citizens of the same state. *Id.* at 666.

In determining whether the parents' citizenship counted for diversity jurisdiction purposes, we stated that under Supreme Court precedents, the key question was whether the parties have "a real interest in the cause." *Id.* at 667. But we further noted that for "[a] party to be 'interested' in an action," it "need not be one who may gain or lose something therein." *Id.* Rather, "[t]he word has a broad meaning, and includes all those who as parties have some control over the action, whether they will be personally affected thereby or not." *Id.* Because control over the action is significant, we noted that "an administrator, a trustee, or an executor is a real party in interest when he is bringing or defending a suit for the estate which he represents" because "[s]uch a party brings or defends the suit—employs counsel—and is directly responsible for going on with the litigation." *Id.* (citing *Chappedelaine v. Dechenaux*, 8 U.S. (4 Cranch) 306 (1808)). Because the parents of the decedent in *Atchison* had neither an interest in the controversy nor any control over it, we held that they were nominal parties, and their citizenship did not count for determining diversity. *Id.*

*Atchison* thus made clear that either control of the case or a tangible interest in it suffices to make the citizenship of a party of record count for diversity purposes. Simply put, parties may have a "real interest" in a case if they have "some control over the action, whether they will be personally affected thereby or not." *Id.* at 667. This rule is not contrary to *Missouri Railway*. While that case concluded that the state's complete lack of interest in litigation was evidence that it was *not* a real party, it did not establish the opposite rule, namely, that obtaining a tangible benefit is *necessary* in order for a state to be a real party in interest. *See* 183 U.S. 53; *see also U.S. Fid. & Guar. Co.*, 204 U.S. at 356-57. Because no subsequent decision of this court has cast any doubt on the *Atchison* rule, we are bound by it. *See Hart v. Massanari*, 266

F.3d 1155, 1170 (9th Cir. 2001) ("If a court must decide an issue governed by a prior opinion that constitutes binding authority, the later court is bound to reach the same result, even if it considers the rule unwise or incorrect.").

The majority concedes that California "arguably" controls the litigation, but relies on *Missouri Railway* for the proposition that "control alone cannot render California a real party in interest because a state can always bestow upon itself control over virtually any lawsuit via legislation." Maj. op. at 5362 n.4. The majority does not quote any language from *Missouri Railway* that supports this proposition. Nor could it, because in fact *Missouri Railway* provides no support for the majority's newly invented rule. Indeed, *Missouri Railway* does not even address the situation present in this case, where a state not only is a named party, but actually controls the litigation.

By contrast, *Atchison* enunciated a rule that is directly on point here: a party to an action "includes all those who as parties have some control over the action, whether they will be personally affected thereby or not." 176 F. at 667. In reaching this conclusion, *Atchison* did not suggest that this rule would apply only to private parties, not to the government. Rather, *Atchison* explained that *Fidelity*, "an action *brought in the name of the United States* for the benefit of materialmen and laborers on bonds given in pursuance of certain acts of Congress," stood for the "principle" that "the parties whose citizenship is important are those who have a tangible interest in the controversy *or exercise some control over it*." *Id.* at 668 (emphases added). Given that *Missouri Railway* is not on point, while *Atchison* is directly applicable, the majority's circumvention of our long-standing rule is inexplicable.

C

In this case, DFEH is the party of record. Moreover, DFEH is the party that brought the suit and is also in control of the

litigation. Indeed, the majority does not dispute that this is DFEH's litigation; it holds that Carauddo had no right of intervention, *see* Maj. op. at 5366-67, and that the district court did not abuse its discretion in placing various limitations on Carauddo as an intervenor, *see* Maj. op. at 5368-69. In light of the rule enunciated in *Atchison* that a party has a "real interest" in the controversy if it has "some control over the action," whether the party "will be personally affected thereby or not," 176 F. at 667, DFEH's complete control over the litigation is sufficient to make DFEH a real party for jurisdiction purposes. Accordingly, the majority errs in suggesting that obtaining benefits from the litigation is a sine qua non of being a real party.

Finally, although DFEH would obtain no monetary benefit from the litigation, I would conclude that DFEH's role in enforcing anti-discrimination laws gives it a sufficiently substantial interest for diversity jurisdiction purposes. The California Fair Employment and Housing Act (FEHA) authorizes DFEH to bring suit in the name of California to "provide effective remedies that will both prevent and deter unlawful employment practices," Cal. Gov't Code § 12920.5 (citing Cal. Const. art. XIV, § 1; Cal. Gov't Code §§ 12930(h), 12965), including injunctive measures such as training and policy changes, *see id.* §§ 12965(c)(3), 12970. Specifically, upon a finding of discrimination or harassment, DFEH's practice is to order the offending employer to "cease and desist the [discriminatory] practice, report the manner of compliance, and take other remedial action as appropriate." *Peralta Cmty. Coll. Dist. v. Fair Emp't & Hous. Comm'n*, 801 P.2d 357, 365 (Cal. 1990) (citing Cal. Gov't Code § 12973). In light of the FEHA's broad remedial purpose, *see* Cal. Gov't Code § 12920 (noting that employment discrimination "foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general"), the California Supreme Court has characterized this procedure as

serving "the statutory purpose of providing effective remedies that will eliminate the discriminatory practice and prevent its recurrence, not just as to the immediate victim, but as to all employees present and future," *Peralta*, 801 P.2d at 365 (citing Cal. Gov't Code § 12920). DFEH's specific statutory responsibility to further a well-defined state interest in remedying discrimination is far removed from the general interest in good government that the Court held was insufficient to constitute an interest in the result of litigation in *Missouri Railway*.

That such an interest is sufficient to give DFEH an interest in the lawsuit for diversity purposes is suggested by the Supreme Court's standing doctrine. As in the context of determining if a party is a real party or merely a nominal party for diversity purposes, the Supreme Court has likewise distinguished between real and nominal parties for standing purposes. In this regard, the Supreme Court has indicated, a state has standing when it raises claims that implicate "its sovereign or quasi-sovereign interests," *Pennsylvania v. New Jersey*, 426 U.S. 660, 665 (1976), and lacks "standing under the *parens patriae* doctrine" when it "is only a nominal party without a real interest in its own," *Alfred L. Snapp & Son v. Puerto Rico*, 458 U.S. 592, 600 (1982). Because California's interest in vindicating its citizens' rights to a discrimination-free workplace is one that it has "attempt[ed] to address through its sovereign lawmaking powers," *id.* at 609, California has *parens patriae* standing to pursue relief for Carauddo. Just as DFEH's interest in the litigation is sufficient to make it a real party for standing purposes, its interest is likewise sufficient to make it a real party for purposes of diversity jurisdiction.

## II

In sum, DFEH is in control of the lawsuit which it is bringing pursuant to a strong state interest in vindicating the state's non-discrimination policies. *Cf. U.S. Fid. & Guar. Co.*, 204

U.S. 349 (holding that the federal government's interest in vindicating the rights of third parties can constitute a pertinent interest in a lawsuit). Under the rule enunciated in *Atchison*, this is more than sufficient to make DFEH a party whose citizenship counts for diversity purposes. Because the parties are not completely diverse, we lack jurisdiction. Therefore, I dissent.