FILED

JUL 10 2018

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



| | |
|---|---|
| PAUL ALLEN WEXLER, | No.   16-56348 |
| Plaintiff-Appellant, | D.C. No. 2:15-cv-03518-AB-AJW |
| v. | |
| JENSEN PHARMACEUTICALS, INC., erroneously sued as, Janssen Pharmaceuticals, Inc.; et al., | MEMORANDUM[*] |
| Defendants-Appellees. | |

Appeal from the United States District Court
for the Central District of California
Andre Birotte, Jr., District Judge, Presiding

Argued and Submitted February 7, 2018
Pasadena, California

Before:  CALLAHAN and NGUYEN, Circuit Judges, and BATAILLON,[**] District Judge.

Paul Allen Wexler started working for Jensen Pharmaceuticals, Inc. (JPI) in

2002 as a sales representative.  In 2011, JPI adopted a new sales model and in

---

[*]      This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

[**]      The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska, sitting by designation.

2012, Jason Plumley became Wexler's supervisor. Wexler had difficulty adapting to the new sales model. He was counseled that he needed to change his sales approach, and Plumley placed Wexler in a Performance Improvement Plan (PIP) when his sales did not improve. Wexler's performance did not improve during the PIP and JPI terminated his employment. Wexler brought this action alleging that his termination was due to age discrimination by Plumley. The district court granted summary judgment for JPI finding that Wexler had not shown that he was performing competently and there was no direct evidence of discrimination. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.[1]

An order granting summary judgment is reviewed de novo. *Weiner v. San Diego Cty.*, 210 F.3d 1025, 1028 (9th Cir. 2000). California's Fair Employment and Housing Act (FEHA) prohibits employers from discharging employees over the age of forty based on their age. Cal. Gov't Code §§ 12926(b), 12940(a). California courts apply the *McDonnell Douglas* burden-shifting framework to analyze disparate treatment claims under FEHA. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973); *Merrick v. Hilton Worldwide, Inc.*, 867 F.3d 1139, 1145–46 (9th Cir. 2017) (citing *Guz v. Bechtel Nat'l Inc.*, 24 Cal. 4th 317

---

[1] The facts are familiar to the parties and are restated here only as necessary to resolve the issues raised in this appeal.

2

(2000)). To prevail on summary judgment, an employer must show either that (1) plaintiff could not establish one of the elements of her FEHA claim or (2) there was a legitimate, nondiscriminatory reason for its decision to terminate plaintiff's employment. *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir. 2013). To make a prima facie showing of discrimination under FEHA, "a plaintiff must show that: (1) she is a member of a protected class; (2) she was performing competently in the position she held; (3) she suffered an adverse employment action, such as termination; and (4) some other circumstances that suggest a discriminatory motive." *Id*.

The district court recognized the applicable *McDonnell Douglas* burden-shifting standard, but found, based on largely undisputed evidence, that Wexler "was not performing competently at the time of his termination." It determined that beginning in 2013:

> Plaintiff's sales results, especially for Invokana, were poor and his performance consistently fell short because he did not successfully adopt the value based selling model. Once Plaintiff was placed on a PIP in 2014, Plumley repeatedly noted that Plaintiff failed to incorporate the new selling model, did not do adequate pre-call planning or execute his plans, and he did not consistently implement Plumley's suggestions. A different manager, Stark, found similar problems: that Plaintiff's calls were ineffective and he failed to do adequate pre-call planning. Plaintiff's performance did not markedly improve during the PIP. Plaintiff was the lowest-performing representative in his district at the time he was terminated.

3

Wexler does not deny that his sales were down, but nonetheless asserts that the real reason for the termination of his employment was age discrimination by Plumley. However, on this record he has not raised a genuine issue of material fact. Wexler's evidence of any age based animus is weak, at best. Plumley is reputed to have commented that "older reps were the hardest reps to train, were most challenging." The district court noted that "it is a stretch to say this comment reflects discriminatory animus, and indeed the Court previously characterized it as unremarkable: whether 'older' employees means employees with more tenure or refers to their age is ambiguous, and furthermore, the remark is not demeaning, but simply characterizes such employees as harder to train." *See Nesbit v. Pepsico, Inc.*, 994 F.2d 703, 705 (9th Cir. 1993) (noting that the supervisor's comment "we don't necessarily like gray hair," although more than a stray remark, was uttered in an ambivalent manner and was not directly tied to the employee's termination). The only other arguably direct evidence of ageism is that Plumley did not allow Wexler to lead the weekly conference calls. But this fact is more reasonably explained on the basis that Wexler was not following the new sales model.

Even if we were to conclude that there was a material issue of fact as to whether Wexler was performing competently, Wexler cannot show that JPI's stated reason for terminating Wexler's employment was a pretext. His efforts to

4

show pretext founder because Wexler alleged that only Plumley, not others at JPI, discriminated on the bases of age, and the record shows that other managers at JPI agreed that Wexler was not performing competently. Wexler admitted that he did not attribute any alleged age-bias comment to any JPI manager other than Plumley. Moreover, the record shows that the Regional Business Manager, a District Business Manager, and an Executive District Manager, all expressed concern that Wexler was not implementing the new sales model. The evidence that multiple managers were aware of Wexler's performance and agreed that he was not performing competently, shows that JPI's reason for terminating Wexler's employment—his poor performance—was not a pretext, even if Plumley was biased against older employees.

Wexler was an outstanding sales representative for JPI for ten years. However, the undisputed evidence in this record shows that he had difficulty adapting when JPI introduced a new sales model, that for over a year JPI counseled him on how to implement the new model, and that Wexler's employment was terminated when, after a PIP, his performance did not improve. Reasonable minds might differ on whether Wexler's performance had deteriorated to the point that his employment should have been terminated, but there is not sufficient evidence in

this record to allow a jury to conclude that JPI terminated Wexler's employment because of Plumley's alleged bias.

The district court's grant of summary judgment for JPI is **AFFIRMED**.

**Wexler v. Jensen Pharmaceuticals, Inc.,  No. 16-56348**

**Bataillon, District Judge, dissenting.**

I respectfully dissent from the majority's conclusion that there is not sufficient evidence in this record from which a jury could conclude that JPI terminated Wexler's employment because of age bias.  I would reverse the district court and allow the action to proceed to trial.

It appears the majority substitutes its judgment for that of a jury as it weighs evidence and credits the testimony of JPI's witnesses over Wexler's.  The majority's analysis gives a selective and incomplete picture of the record in this case.  Giving the plaintiff the benefit of all reasonable inferences, the record reflects ample evidence from which a jury could infer that Wexler was fired, not because of poor performance, but on account of his age.  The evidence suggests that JPI, over the course of several years, set Wexler up for failure and terminated him when he failed to meet largely ambiguous goals.

I am guided by the principle that, under the *McDonnell Douglas* burden-shifting framework, once an employer articulates a legitimate, nondiscriminatory reason for an adverse employment action, the presumption of discrimination created by the prima facie case simply drops out of the picture and the burden shifts back to the employee to demonstrate that the proffered reason is a pretext for discrimination.  *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1242 (9th Cir.

1

2013); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). At the summary judgment stage, the employee can satisfy this burden by "'demonstrat[ing] 'that there [is] a triable issue of fact material to the defendant's showing.'" *Lawler*, 704 F.3d at 1242 (quoting *Dep't of Fair Emp't and Hous. v. Lucent Techs.*, 642 F.3d 728, 746 (9th Cir. 2011)). Also, the evidence as to pretext must be considered cumulatively. *Chuang v. Univ. of Cal. Davis,* 225 F.3d 1115, 1127, 1129 (9th Cir. 2000). Further, summary judgment standards dictate that the facts and inferences must be construed in favor of the nonmoving party and the court may not weigh evidence or determine credibility. *Glenn v. Washington Cty.*, 673 F.3d 864, 870 (9th Cir. 2011) ("We review a district court's decision to grant summary judgment de novo, considering all facts in dispute in the light most favorable to the nonmoving party."); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."). In my view, the majority violates those precepts.

First, I disagree with the majority's finding that the district court recognized the applicable *McDonnell Douglas* burden-shifting standard. My reading of the district court opinion shows that the district court improperly collapsed the objective qualifications for the job at stage one of the burden-shifting paradigm

2

with subjective criteria and evidence that should be addressed at the third stage in considering pretext.[1] Doing so effectively "collapse[s] the three step analysis into a single initial step at which all issues would be resolved and this would defeat the purpose underlying the *McDonnell Douglas* process." *Lynn v. Regents of Univ. of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981); *see also Nicholson v. Hyannis Air Serv., Inc.,* 580 F.3d 1116, 1124 (9th Cir. 2009) (noting the distinction turns on the subjective or objective nature of the matter in question). I submit that the court improperly collapsed the steps on the "competently performing" issue.

I also disagree with the majority's conclusion that Wexler's evidence of age-based animus is weak. Both the district court and the majority improperly discount direct and circumstantial evidence of age bias. First, the record contains direct evidence of discriminatory animus—age-related derogatory comments. The majority acknowledges one example of an arguably negative age-related comment—Plumley's reputed statement that "older reps were the hardest reps to train, were most challenging," but there is other direct evidence of age bias in the

---

[1] The district court found Wexler failed to establish a prima facie case because he could not establish that he was performing competently in his position. I believe the district court erred in that respect. In my view, Wexler presented evidence that satisfies the minimal standard at the first step of the *McDonnell Douglas* paradigm. *See Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 355 (2000) (noting that the plaintiff's prima facie burden is not onerous and requires a showing that the plaintiff (1) was a member of a protected class, (2) was competently performing in his position, (3) suffered an adverse employment action, and (4) some other circumstance suggests discriminatory motive.). Wexler is in the protected class, he suffered an adverse action in that he was terminated, he was objectively qualified for the position in that he had been doing it for eleven years, he was meeting his sales quota, and direct and circumstantial evidence in the record creates an inference of age bias. *See id.*

record. In Wexler's 2013 performance review, Plumley wrote that Wexler "had a difficult time moving away from the traditional detail rep." There is evidence that Plumley also stated that Wexler was "slower than other reps" and "outdated." Wexler stated in his declaration that Plumley called him "oldie," referred to him as "the only real oldie" on the team and told Wexler he was outdated in his ways. Wexler also reported that Plumley told Wexler "an oldie like you needs to get on board with the new regime," and that Wexler "was stuck in the dark ages." Notably, in his declaration, Plumley does not deny making the comments. That evidence, together with other record evidence outlined below, could lead a reasonable jury to conclude that JPI's explanation for his termination is unworthy of credence and that Wexler was, in fact, terminated because of his age.

The majority states that "the only other arguably direct evidence of ageism is that Plumley did not allow Wexler to lead the weekly conference calls[,]" finding that fact "more reasonably explained on the basis that Wexler was not following the new sales model." That statement amounts to blind acceptance of JPI's articulated reason for the termination as legitimate and credible, without consideration of Wexler's evidence that suggests the asserted reason is a pretext. Wexler also presented corroborated evidence that Plumley belittled Wexler in connection with the conference calls. These undisputed facts gain significance because leading sales conference calls was something Wexler was supposed to

4

have done as part of the showing of leadership under the Performance Improvement Plan ("PIP").

I further disagree that the district court's dismissal of the action was "based on largely undisputed evidence" that Wexler was not performing competently. The evidence on Wexler's performance is disputed. Wexler presented evidence that he was projected to meet and exceed his sales quota. The Invokana Radden Report shows that of the seven-person team identified in the July 2014 Memo from Plumley, there were four sales people who were not projected to meet their third quarter quotas in 2014. Notably, none of those arguably poor performers were placed on a PIP or terminated. That evidence suggests that there is at least a genuine issue of material fact on whether Wexler's performance was poor enough to warrant the drastic sanction of termination.

The majority's acceptance of JPI's articulated reason for terminating Wexler's employment—his poor performance and failure to adapt to a values based sales model—without considering evidence in the record that calls JPI's assessment of his performance into doubt, eviscerates the third step of the *McDonnell-Douglas* burden-shifting paradigm. Although the majority concedes that "[r]easonable minds might differ on whether Wexler's performance had deteriorated to the point that his employment should have been terminated," it nonetheless finds "there is not sufficient evidence in this record to allow a jury to

conclude that JPI terminated Wexler's employment because of Plumley's alleged bias." Respectfully, that is not the case.

The majority fails to note that the poor performance rationale was based on what appear to be largely subjective criteria.[2] JPI did not show that Wexler's termination followed a validly and fairly devised and administered procedure designed to serve a legitimate business purpose. *See, e.g., Lucent Techs.*, 642 F.3d at 745. The record shows inconsistencies and disputes on several facts that relate to performance. Wexler testified that he enthusiastically embraced the values-based sales model. His testimony is corroborated by the fact that JPI had moved to the values-based model by 2011 and Wexler had worked under the new model for several years, receiving numerous awards and prizes. Wexler states in his declaration that he performed the actions required of him under the PIP and was on course to achieve and exceed his quota by the end of the year. In response, JPI submits only that Wexler's quota was the lowest in the district. That fact is hardly probative, since the company, after all, sets the quota. Wexler also states in his declaration that "[a]t the end of the fourth Quarter of 2013, I finished at the top 20% of all sales representatives." JPI's response, states that at year-end, Wexler's

---

[2] The PIP, performance reviews, and even the values-based sales model are based on subjective, ambiguous and jargon-laden factors. Wexler's performance evaluations show assessments of "impact" and "leadership" based on vague and subjective criteria such as engaging with a doctor, focusing on benefits or exacting a commitment. "Key competencies" are noted as "selling/customer development, thriving in ambiguity." The goals of the PIP included "strategic and consistent resource utilization" and required Wexler to "elevat[e] impact on sales calls as measured by increased penetration and productivity with Invokana."

6

sales ranking was in the bottom ten percent of all JPI sales representatives nationally. That fact does not necessarily refute Wexler's showing, nor does it address how Wexler performed vis-a-vis the other members of Plumley's seven-member team, or vis-a-vis Wexler's own quota.

Wexler also produced other highly probative evidence of discriminatory motive. It is uncontested that he was terminated shortly before his 2011 and 2012 stock options were to have vested. Wexler's counsel argues the timing of his client's loss but does not directly argue the economic repercussions. There is no evidence concerning the stock option's funding mechanism, nor the gain or loss to either Wexler or JPI. Nonetheless, a jury could reasonably infer that JPI stood to gain from preventing the vesting of one of their historically top performer's stock options and thereby had an incentive to build a case for his termination. Stock options, by their nature, are designed to provide financial incentives to retain employees and thus relate more to older employees. Viewed in the light most favorable to the plaintiff, a reasonable jury could find the timing of Wexler's termination vis-à-vis the vesting of his stock options benefits would support a finding of age-related animus.

The majority also ignores facts that show the decline in sales could have been due to factors other than Wexler's alleged shortcomings in failing to adapt to the new sales model. The record shows that JPI first changed Wexler's territory

7

from Beverly Hills (where he was a national top producer) to Chinatown and Koreatown in 2013 as part of a purported realignment. Then JPI hired Mr. E. Chang, a contract employee (age thirty-eight or thirty-nine at the time), and split Wexler's territory, awarding Chang half the accounts. Plumley made the decision to transfer the accounts to Chang.[3] Importantly, JPI also changed the products Wexler was assigned to sell to newly-launched products—Invokana and Xarelto. There is evidence in the record that sales of those products may have been challenging under any sales model because the drugs may not have been covered by Medicare or insurance.[4] Chang was the employee who was hired to replace Wexler after his termination.

I submit that a jury presented with this timeline of facts and events, coupled with evidence of Wexler's supervisor's age-related bias, could conclude that Wexler's termination was motivated by age discrimination. The issue is not whether Wexler's performance declined. Concededly, it did. The issue is whether JPI fired Wexler not because of his poor performance but because of impermissible

[3] With respect to the sales "void" left by the loss of half of Wexler's accounts, JPI presents the nonsensical explanation that Wexler was expected to call on his remaining accounts twice as often to achieve his workload goal of 800 visits. How that would make up for lost sales is not explained. It stands to reason that returning to the same accounts numerous times trying to make the same sale may not be successful, and possibly could be counter-productive.

[4] Common sense and life experience tell us that there may be many reasons other than poor salesmanship for pharmaceutical sales to fall off—i.e., price, lack of coverage or failure to be placed on an insurer's formulary, inefficacy, or warnings of side effects. In contrast, during the years Wexler was exceeding sales goals and winning awards, he was selling products widely covered by insurance and his performance reviews were replete with references to the drugs being on formularies and managed care plans.

age-related factors. The majority's focus on Wexler's decline in sales, rather than reasons underlying the decline, is misplaced.

Also, the majority's reliance on other managers' agreement that Wexler's performance was poor as causing his showing of pretext to "founder" is unavailing. The record shows Plumley made the decisions to transfer Wexler's accounts, to put him on a PIP, and ultimately to terminate him. The other managers' assessments of Wexler's performance and/or failure to improve under the PIP were based on Plumley's assessments and were elicited as part of Plumley's subjective criteria in the PIP. Although Wexler may have alleged that only Plumley demonstrated age bias, it is undisputed that Plumley was the decision-maker on the adverse actions taken against Wexler, and Plumley's actions are, of course, imputed to the company. Interestingly, no corroborating documents or data accompany JPI's management's declarations, although JPI is presumably in possession of the human resources and sales records that would support its contentions. In a case of this sort, involving a large corporate defendant, one would expect to see documentary evidence of the plaintiff's poor performance in comparison to other employees' performance data to support JPI's poor performance rationale. There is a dearth of evidence as to what Wexler's or other employees' sales quotas were.

There is also unrefuted evidence that other, younger, employees were treated differently than Wexler.[5]

The district court's and the majority's apparent acceptance of the asserted rationale that Wexler had difficulty adapting when JPI introduced a new sales model fails to take account of the subjective nature of the new model and of evidence that Wexler had, in fact, historically adapted to it. The evidence suggests that Wexler's decline in performance was equally likely due to other factors that could show age bias such as changes to his territory and products, and the transfer of his accounts to another, younger salesman. The record contains little objective proof of what could amount to successful adaptation to the values-based model.

The record shows a significant change in Wexler's productivity came about in the last quarters of 2012. That event coincided, not with the advent of the values-based sales model, but with the appearance on the scene of an apparently much younger sales manager with an arguable animus toward older people. There

---

[5] Wexler stated in his declaration that several older people were fired "around or after his termination," naming one employee over sixty and three employees over forty. Again, JPI's evidence in response does not refute that statement, but shows only that the over-sixty employee's job ended after August 4, 2014, and the other three employees were still employed at the end of 2014. The record also shows that other employees, Ms. Baghoumian and Ms. Dittman, were disciplined less harshly than Wexler. Neither employee was put on a PIP or fired. Co-worker Ms. Stears, a contract employee, states in her declaration that at the time Wexler was terminated, another employee, Ms. Mast (age low thirties), had lower sales than Wexler and was not disciplined or fired. To refute that evidence, JPI offers only that Mast "is the #1 Primary Care representative in the Pacific region through April 2016 and the #5 Primary care representative nationally," but does not address her position at the time of Wexler's PIP or termination. Stears, who was forty-three at the time of her declaration, also stated that she applied for a full-time position twice and each time Plumley hired a person under forty, although Stears was a better performer than those individuals.

10

is evidence from which a rational jury could find that the decline in Wexler's performance was due to circumstances set in motion by JPI in an effort to build a case against him, terminate him, and to ensure the result that his termination would appear justified. A jury could also infer that the fact that Wexler's stock option benefits would not vest would inure to the benefit of the corporation. These facts, combined with the age-related negative comments, at the least create an issue of fact on pretext.

Respectfully, I suggest that the district court failed to view the evidence in the light most favorable to Wexler and, in doing so, erroneously concluded that his version of events did not create issues of fact that deserve a jury trial. For these reasons I respectfully dissent, believing that there are genuine issues of material fact that preclude summary judgment on Wexler's age discrimination claim. I would reverse the district court's dismissal and remand the action to the district court for trial.